William **SHAPIRO**, Petitioner

v.

**STATE BOARD OF ACCOUNTANCY,**
**Respondent.**

**Kenneth Steven Shapiro, Petitioner**

v.

**State Board of Accountancy,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 30, 2004.
Decided July 26, 2004.
Reargument and/or Reconsideration Denied Sept. 17, 2004.

William Shapiro and Kenneth S. Shapiro, petitioners, pro se.

Steven Wennberg, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, and SIMPSON, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge SIMPSON.

William Shapiro (William) and Kenneth Steven Shapiro (Kenneth) (collectively, Pe-titioners), professionals representing themselves, petition for review of an order of the State Board of Accountancy (Board) revoking the certificate of certified public accountant and biennial license of Kenneth and revoking the certificate of certified public accountant of William.

The Commonwealth Bureau of Professional and Occupational Affairs (Bureau) filed Amended Orders to Show Cause against Petitioners, seeking to have their licenses, certificates, registrations, or permits revoked or restricted under the CPA Law.[1] Specifically, the Bureau asserted that, because Petitioners were barred from registration as broker-dealers, agents, or affiliates of any person registered under the Pennsylvania Securities Act of 1972,[2] and also were barred from associating with any broker or dealer under the Securities Exchange Act of 1934,[3] they were subject to discipline under Section 9.1 of the CPA Law.[4] 63 P.S. § 9.9a(a)(8).[5] The Bureau also asserted Petitioners were subject to discipline under the CPA Law for, "[e]ngaging in unprofessional conduct," 63 P.S. § 9.9a(a)(16), because they failed to comply with standards promulgated by the Pennsylvania Securities Commission. 63 P.S. § 9.9a(c)(5).

Petitioners filed answers and requests for hearings. The Board held a hearing and issued its 38–page adjudication and order, finding Petitioners violated the CPA Law. The Board ordered Kenneth to surrender his certificate of certified public accountant and license documents, and or-

1. Act of May 26, 1947, P.L. 318, *as amended,* 63 P.S. §§ 9.1–9.16b.

2. Act of December 5, 1972, P.L. 1280, *as amended,* 70 P.S. §§ 1–101—1–612.

3. 15 U.S.C. §§ 78a–78mm.

4. Added by Act of September 2, 1961, P.L. 1165.

5. That section of the CPA Law states, "[T]he board may revoke, suspend, limit or otherwise restrict the certificate of a certified public accountant ... for any one or any combination of the following causes: ... (8) Suspension or revocation of the right to practice before any Federal or State governmental agency." 63 P.S. § 9.9a(a)(8).

dered William to surrender his certificate of certified public accountant.

In doing so, the Board made the following Findings of Fact. The Board found William was sole shareholder, secretary/treasurer, and director of Welco Securities, Inc. (Welco) and Kenneth served as Welco's president and director. Board Finding of Fact (F.F.) No. 4. Petitioners also were controlling shareholders of Walnut Equipment Leasing Company, Inc. (Walnut) and its wholly owned subsidiary, Equipment Leasing Corporation of America (ELCOA), both of which financed leases of small business equipment. F.F. No. 5. William was chief executive officer, financial officer and accountant of both Walnut and ELCOA and president of ELCOA. *Id.* Kenneth served as vice-president of both companies. *Id.*

Welco registered with the Securities and Exchange Commission (SEC) as a broker-dealer in 1983. F.F. No. 6. Kenneth served as general securities principal, while William served as financial/operations principal and general securities principal. *Id.* Welco's primary function was to underwrite and sell securities issued by Walnut and ELCOA. F.F. No. 7.

Walnut and ELCOA experienced annual operating losses that grew larger each year. F.F. No. 8. Walnut and ELCOA generated funds to pay their expenses and interest payments to existing debentureholders by selling new issues of debt securities as unsecured debentures. F.F. No. 9. Investors purchasing those unsecured debentures incurred substantial and immediate risk of losing their investment principals due to the precarious financial condition of Walnut and ELCOA. *Id.*

Petitioners, through Welco, marketed and distributed the unsecured debentures to their brokerage clients. F.F. No. 10. Welco also solicited investors through kiosks located in airports, bus stations, and other public places. F.F. No. 10. People who inquired at the kiosks were led to believe Welco would review their brokerage account applications to determine if investing in the unsecured debentures was suitable for them. F.F. No. 11. If Welco deemed the investment suitable, it would trade for the debentures through the new brokerage account. *Id.* Current investors were solicited from time to time to make additional purchases; again, those investors were led to believe Welco would review the suitability of the investment to each investor's needs. *Id.*

Welco's clients were generally unsophisticated and risk-averse investors for whom the highly speculative nature of the unsecured debentures made them an unsuitable investment. F.F. No. 12. However, Welco and Petitioners recommended and sold the unsecured debentures to all but a handful of their clients. *Id.*

Welco and Petitioners sold approximately $6 million worth of unsecured debentures in violation of state registration requirements. F.F. No. 13. Welco and Petitioners encouraged investors from states where the debentures were not registered to use an address in a state where the debentures were registered; this subjected Welco, Walnut, and ELCOA to penalties from state regulators that would have materially affected the companies' financial status. *Id.* Welco and Petitioners did not disclose these facts to investors. *Id.*

From October 1996 to August 1997, Welco and Kenneth failed to make and keep current books and records for Welco. F.F. No. 14. During that same time period, Welco and Kenneth concealed violations of state registration requirements by maintaining altered client account forms. F.F. No. 15.

From December 1995 through August 1997, Welco and Petitioners aided and abetted a person, who was not registered with the SEC, to act as a broker-dealer by allowing him to place trades for debentures through Welco, use Welco's account forms and sales materials, and maintain customer accounts at Welco. F.F. No. 16. Welco also paid this unregistered broker-dealer commissions for his sales of debentures. *Id.*

Walnut and ELCOA filed for bankruptcy in 1997. F.F. No. 17. Based on that filing, it seemed likely most debenture-holders would lose most of their assets. *Id.*

From 1988 through 1997, Welco and Petitioners, pursuant to this fraudulent scheme and in violation of federal securities laws, sold approximately $60 million worth of the unsecured debentures to 7,000 investors nationwide. F.F. No. 18.

In August 1999, the SEC filed a four-count complaint against Welco and Petitioners in the United States District Court for the Eastern District of Pennsylvania, charging them with violating various federal securities laws. F.F. No. 20.[6] That same date, the district court entered a final judgment and order of permanent injunction against Welco and Petitioners. F.F. No. 21. The SEC thereafter issued a consent order in which it revoked Welco's broker-dealer registration and barred Petitioners from association with any broker or dealer. F.F. No. 22.

Welco also registered as a broker-dealer with the Pennsylvania Securities Commission (PSC) in 1983, and Petitioners registered with PSC as agents of Welco. F.F. No. 23. Welco underwrote Walnut and ELCOA securities, and Petitioners were affiliates of Welco, Walnut, and ELCOA. F.F. Nos. 24–25.

Because they were not registered as securities with the SEC, Kenneth advised PSC no offers or sales of certain ELCOA and Walnut certificates would be made in Pennsylvania. F.F. No. 26. Nevertheless, those certificates were sold to Pennsylvania residents without being registered in Pennsylvania. F.F. Nos. 27, 30.

Welco's registered agents used material misrepresentations to induce people living in and outside Pennsylvania to purchase Walnut certificates and to give fake addresses in states other than Pennsylvania in order to execute the sales; Petitioners knew or should have known about this practice. F.F. No. 28. Additionally, Welco and Petitioners offered and sold Walnut certificates to investors without disclosing they were violating Pennsylvania securities law. F.F. No. 29. Some investors were not given a prospectus or any other meaningful disclosure documents. *Id.*

At least 26 ELCOA certificates were sold to at least 21 Pennsylvania residents, for an amount of at least $292,190. F.F. No. 30. None of those certificates was registered in Pennsylvania. *Id.* Twenty-one of those ELCOA certificates were sold by a person named John J. McGarry who was not a registered agent with Welco. F.F. No. 31.

Welco, Petitioners, and McGarry used a single fictitious address in New York as the address of those Pennsylvania residents who purchased ELCOA certificates. F.F. No. 32. In some cases, the investors' Pennsylvania addresses on their applications were concealed with typewriter correction strip. *Id.* Petitioners knew or should have known of this practice. *Id.*

---

**6.** This Finding of Fact is mistakenly numbered in the Board's adjudication as Finding of Fact Number 29; however, it is clear from the numeric progression that it is, in fact, Number 20.

The ELCOA certificates were offered without disclosing they were being made in violation of Pennsylvania law, and some of the investors were not given a prospectus or other disclosure documents. F.F. No. 34.

Some of Welco's registered representatives, through misrepresentations and non-disclosures, induced investors either to not redeem or to delay redemption of Walnut and ELCOA certificates. F.F. No. 35. Welco and Petitioners knew or should have known of this practice. *Id.*

Welco, Petitioners, and Welco's registered representatives recommended their investors purchase Walnut and ELCOA certificates without having grounds to believe the certificates were suitable for each investor's needs. F.F. Nos. 36–37. Welco and Petitioners did not establish a system of procedures for detecting and preventing securities violations. F.F. No. 38. Welco and Petitioners did not fulfill their fiduciary duty to act primarily for the benefit of Pennsylvania customers, nor did they maintain high standards of commercial honor and just and equitable principles of trade. F.F. No. 39. Welco and Petitioners engaged in dishonest and unethical conduct in the securities business and took unfair advantage of their customers. F.F. No. 40.

PSC issued its Findings of Fact, Conclusions of Law, and Order (PSC Adjudication) in December 1999. R.R. at 18a–37a. In doing so, PSC revoked Welco's registration as a broker-dealer and revoked Petitioners' registrations as agents of Welco. R.R. at 35a. PSC permanently barred Welco from being registered as a broker-dealer or from being affiliated with a bro-

ker-dealer in Pennsylvania. *Id.* PSC also permanently barred Petitioners from: 1) representing an issuer as an agent offering or selling securities (with certain exceptions); 2) acting as promoters, officers, directors, or partners of an issuer offering or selling securities in Pennsylvania (with certain exceptions); and 3) being registered as broker-dealers, agents, or affiliates of any person registered under the Pennsylvania Securities Act. R.R. at 35a–36a. PSC ordered Welco and Petitioners to pay $20,000 in costs to the Commonwealth of Pennsylvania. R.R. at 36a.

■ After making these extensive Findings of Fact, the Board found Petitioners violated 63 P.S. § 9.9a(a)(8), since their rights to practice before both the SEC and PSC were revoked. Further, the Board found Petitioners engaged in unprofessional conduct in violation of 63 P.S. § 9.9a(a)(16). Accordingly, the Board revoked Kenneth's certificate of certified public accountant and current biennial license, and revoked William's certificate of certified public accountant. This appeal followed.[7]

### I.

Petitioners first argue their cases should be dismissed because the Board failed to hold a hearing within 90 days after Petitioners filed their answers in accord with 63 P.S. § 2203(d).[8] The relevant portion of that statute states, "In all disciplinary matters before a licensing board or commission, hearings shall commence within 90 days after the date on which an answer is filed." *Id.* Petitioners argue this portion of the statute is mandatory, not directory,

---

7. Our review in an appeal from a state agency adjudication is limited to a determination of whether constitutional rights were violated, an error of law was committed, or necessary findings of fact are supported by substantial evidence. *Trakes v. Pub. Sch. Employes' Ret. Sys.*, 768 A.2d 357 (Pa.Cmwlth.2001).

8. Section 3 of the Act of July 2, 1993, P.L. 345.

and therefore, because Petitioners' answers were filed February 19, 2002, but the hearing was not held until August 28, 2002, they were entitled to dismissal.

This Court consistently holds that, "[W]here a statute fixes a time for an adjudicating body, the language of the statute will be construed as *directory* because the courts cannot punish any of the litigants for the actions of the adjudicator." *Schulze v. Bureau of Prof'l and Occupational Affairs*, 794 A.2d 984, 988 (Pa. Cmwlth.2002) (*quoting Pub. Serv. Water Co. v. Pennsylvania Pub. Util. Comm'n*, 165 Pa.Cmwlth. 463, 645 A.2d 423, 430 (1994)) (emphasis in original). While failure to follow a mandatory statute renders the proceedings void, failure to follow a directory one does not. *West Penn Power Co. v. Pennsylvania Pub. Util. Comm'n*, 104 Pa.Cmwlth. 21, 521 A.2d 75 (1987).

In *Schulze*, this Court considered the following language from 63 P.S. § 2203(d): "A decision shall be rendered within 180 days after the record is closed." We concluded the language was directory rather than mandatory since it purports to fix a time within which an adjudicating body must perform an act. Similarly, the statutory language here requiring hearings to be held within 90 days after the date on which an answer is filed is directed toward the adjudicating body and, therefore, is directory rather than mandatory.

Also, it is noteworthy that Petitioners do not claim actual prejudice from the delay. Considering the foregoing, we see no merit whatsoever in Petitioners' contention.

## II.

Petitioners next argue the record does not support the Board's findings that they violated any provisions of the CPA Law.

### A.

First, Petitioners argue the Board's Findings of Fact are based solely on uncorroborated hearsay and, thus, must be stricken.

Ordinarily, hearsay evidence is inadmissible unless some exception applies. Pa.R.E. 802. However, that rule is relaxed in proceedings before administrative agencies. *Rox Coal Co. v. Workers' Comp. Appeal Bd. (Snizaski)*, 570 Pa. 60, 807 A.2d 906 (2002). Petitioners rely on what is commonly known as the "*Walker* rule", set forth in *Walker v. Unemployment Comp. Bd. of Review*, 27 Pa.Cmwlth. 522, 367 A.2d 366 (1976). There, this Court established the following standard to apply to the use of hearsay evidence during administrative proceedings:

(1) Hearsay evidence, Properly objected to, is not competent evidence to support a finding of the Board; (2) Hearsay evidence, Admitted without objection, will be given its natural probative effect and may support a finding of the Board, If it is corroborated by any competent evidence in the record, but a finding of fact based Solely on hearsay will not stand.

*Id.* at 370 (citations omitted). Our Supreme Court adopted the *Walker* rule and affirms its use in appropriate cases. *See, e.g., Rox Coal Co.*

Petitioners did not raise hearsay objections to the documents they now dispute.[9]

9. The disputed documents were admitted twice, once at a hearing on December 12, 2001 and again at a hearing on August 28, 2002. The documents were admitted without any objection and marked as Exhibits C–3 and C–6 at the first hearing. Certified Record (C.R.), Volume I, No. 11, Pages 11–12. The only objection raised to their admission at the second hearing (where they were marked as Exhibits C–9 and C–10) was to their authen-

Accordingly, we must determine, first, whether the documents constitute hearsay; second, if they are hearsay, we must determine if the Board's Findings of Fact are based solely on hearsay or whether there is some other competent evidence to corroborate those findings. Because we determine there are three different categories of evidence, we address each in turn.

### 1. PSC Adjudication

Petitioners object to the PSC Adjudication[10] on two grounds: 1) that it constitutes hearsay that may not form the sole basis for findings of fact; and 2) that the findings of fact contained in the PSC Adjudication were never admitted to or found after a hearing and, thus, the Board may not rely on them to make its findings.

■ We first determine if the PSC Adjudication constitutes hearsay. Pennsylvania did not adopt the federal formulation of including a hearsay exception for public records and reports. Pa.R.E. 803(8) cmt. Rather, at 42 Pa.C.S. § 6103(a), Pennsylvania sets forth separate rules for the admissibility of official records:

> An official record kept within this Commonwealth by any court, district justice or other government unit, or an entry therein, when admissible for any purpose, may be evidenced by ... a copy attested by the officer having the legal custody of the record, or by his deputy, and accompanied by a certificate that the officer has the custody. The certificate may be made by any public officer having a seal of office and having official

duties with respect to the government unit in which the record is kept, authenticated by the seal of his office. . . .

When official records are properly certified as § 6103(a) requires, they are admissible as evidence that the governmental action taken therein was in fact taken. 42 Pa.C.S. § 6104(a). In addition:

> A copy of a record authenticated as provided in section 6103 disclosing the existence or nonexistence of facts which have been recorded pursuant to an official duty ... shall be admissible as evidence of the existence or nonexistence of such facts, unless the sources of information or other circumstances indicate lack of trustworthiness.

42 Pa.C.S. § 6104(b). The Comments to Pa.R.E. 803(8) indicate this rule is meant to function as an exception to the hearsay rule for public records. ("An exception to the hearsay rule for public records is provided by 42 Pa.C.S.A. § 6104.")

Accordingly, if the PSC Adjudication is properly certified, it is admissible to prove the existence of the facts found therein if the circumstances do not indicate lack of trustworthiness. We conclude the PSC Adjudication is properly certified. It is accompanied by a document titled, "Pennsylvania Securities Commission—Certification", in which M. Joanna Cummings, Secretary of the PSC, certifies that the attached PSC Adjudication is a true and correct copy of the PSC Adjudication as it remains on file in the PSC offices. The Certification is signed by Cummings and

---

ticity, not that the documents constituted hearsay. R.R. at 125a. The disputed documents were attached to the pleadings filed against each Petitioner.

**10.** The PSC Adjudication is found at R.R. 18a–37a and was introduced into evidence as pages 1–20 of Exhibit C–3 (C.R., Volume I, No. 14); pages 0–19 of Exhibit 1 to Exhibit

C–6 (C.R., Volume 1, No. 17, Exhibit 1); pages 1–20 of Exhibit 1 to Exhibit C–9 (C.R., Volume II, No. 37, Exhibit 1); and pages 1–20 of Exhibit 1 to Exhibit C–10 (C.R., Volume II, No. 38, Exhibit 1).

For each document appearing multiple times in the record, our discussion applies to all appearances of the document.

accompanied by the seal of the PSC. Because it is properly certified, the PSC Adjudication may serve as a basis for findings of fact relative to the facts set forth therein so long as the circumstances do not indicate a lack of trustworthiness.

Petitioners argue the facts set forth in the PSC Adjudication are not trustworthy and may not be relied on because they were never admitted or found after a hearing. Petitioners point to the language in the PSC Adjudication that notes, "Respondents, without admitting or denying the allegations therein, have submitted the attached Offer of Settlement to the Commission solely for the purpose of settling this proceeding and consent to the Commission's making findings and conclusions and imposing sanctions." R.R. at 19a. We disagree.

Here, the contents of the PSC Adjudication are trustworthy because they were developed through a process during which Petitioners were afforded an opportunity to be heard and to challenge. Their refusal to use the opportunity does not imperil the trustworthiness of the process. *Kahn v. State Bd. of Auctioneer Exam'rs*, 785 A.2d 512, 516 n. 5 (Pa.Cmwlth.2001).[11]

In *Kahn*, the State Board imposed reciprocal discipline on an auctioneer whose license was revoked in Virginia and Maine. We noted reciprocal discipline could not be imposed where it was, "neither based on

an admission of misconduct nor any *finding of fact* regarding the alleged misconduct." *Id.* at 518 (emphasis added). In *Kahn*, we permitted reciprocal discipline where the consent agreement from Maine stated, "Mr. Kahn denies, does not admit, but does not contest allegations of [the complaint]." *Id.*

That language is similar to the language in the PSC Adjudication, "Respondents, without admitting or denying the allegations therein, ... consent to the Commission's making findings and conclusions and imposing sanctions." R.R. at 19a. Further, the PSC adjudication contains findings of fact as required by *Kahn*. Therefore, those findings may serve as a basis for the Board's Findings of Fact in support of the Board's imposition of discipline on Petitioners.

Because the PSC Adjudication meets the requirements of §§ 6103 and 6104, it constitutes an exception to the hearsay rule and, therefore, does not fall under the *Walker* rule. Accordingly, those Findings of Fact made by the Board that are supported by the PSC Adjudication are supported by competent evidence,[12] and we affirm those Findings.[13]

**2. Settlement documents with PSC**

The next document of which Petitioners complain is the Offer of Settlement filed with the PSC by Petitioners.[14]

---

**11.** Our Supreme Court affirmed this decision "in all respects". *Khan v. State Bd. of Auctioneer Exam'rs*, 577 Pa. 166, 842 A.2d 936 (2004). No explanation is given for the difference in spelling between this Court ("Kahn") and the Supreme Court ("Khan").

**12.** The Board Findings of Fact that are supported by the PSC Adjudication and, therefore, are affirmed include Nos. 4–5, 23–40, and 42–43.

**13.** We note this also disposes of Petitioners' argument that no competent evidence exists

to find violations after February 3, 1997, the effective date of the amendment to the CPA Law that included a definition of "unprofessional conduct." 63 P.S. § 9.9a(c). The PSC Adjudication specifically found violations through August 8, 1997 (Paragraphs 20, 27, 42).

**14.** The Offer of Settlement is found at R.R. 38a–42a and was introduced into evidence as pages 21–25 of Exhibit C–3 (C.R., Volume I, No. 14); unnumbered pages at the end of Exhibit 1 to Exhibit C–6 (C.R., Volume 1, No. 17, Exhibit 1) (including two copies of the

The Offer of Settlement was included as an attachment to the PSC Adjudication and, thus, is admissible under the above analysis involving official records. However, § 6103 makes clear that it only applies to official records that are "admissible for any purpose". 42 Pa.C.S. § 6103(a). As this Court noted, "The phrase when admissible for any purpose in Section 6103 indicates that this section cannot be used to introduce otherwise inadmissible evidence." *Pennsylvania State Police, Bureau of Liquor Control Enforcement v. 139 Horseshoe Corp.*, 157 Pa. Cmwlth. 283, 629 A.2d 290, 291 (1993). Accordingly, although the Offer of Settlement was attached to a properly authenticated official record, if it is inadmissible under some other rule it must not be admitted.

We determine the Offer of Settlement is inadmissible under Pa.R.E. 408, which states,

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

However, receipt of the Offer of Settlement was harmless error, because no findings of fact or conclusions of law were based on it. Additionally, Petitioners admitted in their pleadings that they entered into an Offer of Settlement with PSC. R.R. at 78a, 83a.

### 3. Documents Concerning the SEC Action

Finally, Petitioners complain that the circumstances described in the SEC Action are hearsay.[15] We agree.

Similar to the provisions discussed above for admission of official records of the Commonwealth or its agencies, the Pennsylvania legislature provides a mechanism for the admission of official records from other jurisdictions within the United States. That rule states,

> An official record kept within the United States ... when admissible for any purpose may be evidenced by an official publication thereof or by a copy attested by the officer having the legal custody of the record, or by his deputy, and accompanied by a certificate that the officer has the custody.

42 Pa.C.S. § 5328(a). Accordingly, in order for these documents, which constitute official records of the SEC[16] and the United States District Court for the Eastern District of Pennsylvania,[17] to be admissible

Offer of Settlement and proposed findings of fact, conclusions of law, and order); pages 21–25 of Exhibit 1 to Exhibit C–9 (C.R., Volume II, No. 37, Exhibit 1); and pages 21–25 of Exhibit 1 to Exhibit C–10 (C.R., Volume II, No. 38, Exhibit 1).

15. These documents are found at R.R. 43a–75a and were introduced into evidence as Exhibit 2 to Exhibit C–3 (C.R., Volume I, No. 14, pages 26–58); Exhibit 2 to Exhibit C–9 (C.R., Volume II, No. 37, Exhibit 2, pages 26–58); and Exhibit 2 to Exhibit C–10 (C.R., Volume II, No. 38, Exhibit 2, pages 26–58). These documents only appear three times in

the record, because they are not attached to Exhibit C–6.

16. R.R. at 43a–45a, captioned "United States of America—Before the Securities and Exchange Commission—Order Instituting Public Proceedings, Making Findings and Imposing Remedial Sanctions"; and R.R. at 74a–75a, captioned "United States Securities and Exchange Commission Litigation Release No. 16253/August 17, 1999".

17. R.R. at 46a–56a, captioned "Complaint"; R.R. at 57a–62a, captioned "Final Judgment and Order of Permanent Injunction"; R.R. at

as an exception to the hearsay rule, they must be properly certified as provided in § 5328.

■ No certification appears in the record, and no records custodian appeared to testify personally to the authenticity of the documents. Therefore, these documents constitute hearsay.

Having determined these documents are hearsay, we must apply the *Walker* rule and determine if any of the Board's Findings of Fact are solely supported by these documents; if so, we must strike those Findings.

Board Findings of Fact Nos. 6–22 pertain to the SEC events and are based on these hearsay documents. The only other references of record regarding the SEC events are Petitioners' pleadings,[18] in which they admit the SEC issued an Order Instituting Public Proceedings, Making Findings and Imposing Remedial Sanctions against them (R.R. at 79a, 84a), admit the SEC's Order barred them from associating with any broker or dealer under the Securities Exchange Act (*Id.*), and admit the Order also revoked the registration of Welco, of which William was owner, secretary, treasurer, financial/operational principal and general securities principal and Kenneth was president and general securities principal (*Id*).

Accordingly, the Board's Findings of Fact 6–22 are solely based on hearsay, with the exception of that portion of Finding of Fact No. 20 that notes the SEC initiated proceedings against Petitioners and that portion of Finding of Fact No. 22 that notes Welco's broker-dealer registra-

tion was revoked and Petitioners were barred from associating with any broker or dealer, as those portions of those Findings of Fact are corroborated by the Answers filed by Petitioners. Under the *Walker* rule, then, those Findings of Fact will not stand and must be stricken (with the noted exceptions).

## B.

Having determined which Findings of Fact are supported by competent evidence, we turn to Petitioners' argument that those Findings of Fact are insufficient to support the conclusion that Petitioners violated the CPA Law. Specifically, Petitioners assert their right to practice before a state agency was not revoked, their right to practice before a federal agency was not revoked, and they did not engage in unprofessional conduct.

### 1. Practice before the PSC

In Count One, the Bureau asserts Petitioners are subject to discipline under the CPA Law because their rights to practice before the PSC were revoked. The Bureau relies on § 9.9a(a)(8), which permits revocation, suspension, limitation, or restriction of licenses for "Suspension or revocation of the right to practice before any Federal or State governmental agency." 63 P.S. § 9.9a(a)(8). The Bureau asserted, and the Board agreed, that the PSC discipline had the effect of barring Petitioners from practice before PSC.

Petitioners counter they are not subject to discipline under this section because their right to practice as *accountants* be-

---

63a–68a, captioned "Consent of William S. Shapiro and Welco Securities, Inc."; and R.R. at 69a–73a, captioned "Consent of Kenneth S. Shapiro".

**18.** The Amended Orders to Show Cause filed against Petitioners, and their Answers thereto,

were admitted into evidence as Exhibits Commonwealth–9, –10, –11, and –12. Although Petitioners object to the admission of the exhibits to the Amended Orders to Show Cause as discussed at length above, Petitioners do not argue the pleadings themselves were improperly admitted.

fore a state agency was not revoked or suspended. Further, Petitioners state the things they are barred from doing before the PSC do not constitute "practice" before the PSC. We address each argument in turn.

■■■■ Petitioners' argument that, in order to be disciplined under § 9.9a(a)(8) their right to practice as *accountants* must have been revoked or suspended, is unpersuasive.[19] Initially, we note the oft-stated principle that, "The interpretation of a statute by those charged with its execution is entitled to great deference, and will not be overturned unless such construction is clearly erroneous." *Caso v. Workers' Comp. Appeal Bd. (Sch. Dist. of Phila.)*, 576 Pa. 287, 291–92, 839 A.2d 219, 221 (2003). The Board interprets the term "right to practice" to mean, not just the narrow right to practice accounting, but the broad right to any type of licensed practice.

■■■■ When the words of a statute are clear and free from ambiguity, we may not disregard the letter of the statute under the pretext of pursuing its spirit. 1 Pa. C.S. § 1921. Further, although we must "listen attentively to what a statute says[;] [o]ne must also listen attentively to what it does not say." *Kmonk–Sullivan v. State Farm Mut. Auto. Ins. Co.*, 567 Pa. 514, 525, 788 A.2d 955, 962 (2001). We may not insert a word the legislature failed to supply into a statute. *Key Sav. & Loan Ass'n*

*v. Louis John, Inc.*, 379 Pa.Super. 226, 549 A.2d 988, 991 (1988).

The legislature chose not to insert words limiting this provision to those persons whose right to practice *accounting* before any state board was revoked or suspended. We cannot insert those words into the statute. Therefore, the Board's interpretation that § 9.9a(a)(8) applies to revocation or suspension of any right to licensed practice before any state agency is not erroneous.[20]

Next, Petitioners advance the remarkable assertion that their right to practice before the PSC was not revoked. Petitioners argue being registered with the PSC does not amount to a right to practice before the PSC.

■■■■ The Board found Petitioners' right to practice before the PSC was revoked. The Board noted the Pennsylvania Securities Act and its regulations do not define what is meant to "practice" before the PSC. The Board asserted that, in the absence of such a definition, it is appropriate for the Board to turn to federal securities laws for guidance. *See generally, Martin v. ITM/Int'l Trading & Mktg. Ltd.*, 343 Pa.Super. 250, 494 A.2d 451 (1985).

The Board then looked to the Code of Federal Regulations, 17 C.F.R. § 201.102(f), which states, "[P]racticing before the [SEC] shall include, but shall not

---

**19.** We note the only other case interpreting § 9.9a(a)(8), *Goldberger v. State Bd. of Accountancy*, 833 A.2d 815 (Pa.Cmwlth.2003), involved a situation where a licensee's right to practice before the SEC as an *accountant* was revoked. However, nothing in that case limits the application of § 9.9a(a)(8) to revocation of a right to practice as an accountant.

**20.** This is particularly so where § 9.9a(a)(7) specifically provides for discipline for, "[c]ancellation, revocation, suspension or refusal to renew his authority to practice as a certified

public accountant or public accountant by any other state or foreign jurisdiction...." 63 P.S. § 9.9a(a)(7). If we were to give § 9.9a(a)(8) the exact same interpretation, it would render § 9.9a(a)(8) mere surplusage, which is inconsistent with principles of statutory interpretation. *Lynch v. Owen J. Roberts Sch. Dist.*, 430 Pa. 461, 469, 244 A.2d 1, 5 (1968) ("[T]he Legislature is presumed not to have intended its laws to contain surplusage.").

be limited to: (1) Transacting any business with the [SEC]. . . ." Applying that definition to the PSC, the Board concluded it is clear that Petitioners are barred from transacting any business with PSC.

The Board's interpretation of the term "right to practice" was not erroneous. Petitioners were barred from registration as broker-dealers, agents, or affiliates of any person registered under § 301 of the Pennsylvania Securities Act, 70 P.S. § 1–301.[21] Section 301(a) notes, "It is unlawful for any person to transact business in this State as a broker-dealer or agent unless he is registered under this act." Since Petitioners were barred from registration, they may not transact business as broker-dealers or agents in this Commonwealth or appear before the PSC in that capacity. This falls squarely within the definition of "practice" provided in 17 C.F.R. § 201.102(f) quoted above. Accordingly, the Board did not err in finding Petitioners' right to practice before the PSC was revoked.

## 2. Practice before the SEC

Petitioners admit they are barred from associating with any broker or dealer by the SEC. Under the same analysis as above, the Board did not err in finding Petitioners' right to practice before the SEC was revoked.

## 3. Unprofessional Conduct

Finally, Petitioners argue they did not engage in unprofessional conduct. They assert there are no facts of record to support a finding they failed to comply with any standard promulgated by a recognized

standard-setting body as required by 63 P.S. § 9.9a(c)(5).

The Board's finding that Petitioners engaged in unprofessional conduct was not erroneous. Among other violations, the PSC found Petitioners violated its regulation[22] found at 64 Pa.Code 305.019. That regulation states, "Every person registered under section 301 of the act is a fiduciary and has a duty to act primarily for the benefit of its customers. Further, these persons shall observe high standards of commercial honor and just and equitable principals of trade in the conduct of their business." 64 Pa.Code 305.019(a).

■ The Board specifically found: 1) Petitioners knew or should have known "two of Welcos registered agents used material misrepresentations to induce persons in and outside of Pennsylvania to purchase Walnut certificates and to give fictitious residential addresses in states other than the states of their actual residence in order to execute the sales" (F.F. No. 28); 2) Petitioners "offered and sold Walnut certificates to investors without disclosing that the offers and sales were made in willful violation of Pennsylvania law" (F.F. No. 29); 3) Petitioners "used a single fictitious address in New York as the home address of Pennsylvania residents to whom McGarry had sold ELCOA certificates. In some cases, the investors Pennsylvania address on a purchase application was concealed with a typewriter correction strip reflecting the fictitious New York address, a practice about which [Petitioners] knew or should have known" (F.F. No. 32); 4) Petitioners knew or should have known

---

**21.** Act of December 5, 1972, P.L. 284, *as amended.*

**22.** This regulation is a "standard" set by the PSC, a body empowered to enact regulations. "Standard" is defined as, "something that is established by authority, custom, or general

consent as a model or example to be followed." Webster's Third New International Dictionary 2223 (1993). The regulation falls within that definition as it sets forth the model for broker-dealers to follow.

"some of Welcos registered representatives, through misrepresentations and non-disclosures, induced investors either not to redeem or to delay redemption of Walnut and ELCOA certificates" (F.F. No. 35); 5) Petitioners "recommended the purchase of Walnut and ELCOA certificates to investors without having reasonable grounds to believe that the recommendation was suitable for each investors needs" (F.F. No. 36); and 6) Petitioners knew or should have known "Welcos registered representatives recommended the purchase of Walnut and ELCOA certificates to investors without having reasonable grounds to believe that the recommendation was suitable for each investors needs." F.F. No. 37.

Given the above Findings of Fact, Petitioners failed to comply with the standard set forth by the PSC and, thus, engaged in unprofessional conduct under 63 P.S. 9.9a(a)(16). The Board did not err in finding Petitioners subject to discipline under 9.9a(a)(16).

### C.

■■■ Having determined the Bureau proved Petitioners violated §§ 9.9a(a)(8) and (16) of the CPA Law, we address the discipline decided upon by the Board. In deciding to revoke Petitioners' licenses, the Board noted the discipline options from which to choose: 1) censure or reprimand; 2) remedial action such as continuing education or peer review; or 3) restriction, suspension, or revocation of Petitioners' CPA credentials. The Board chose the most restrictive form of discipline, revocation, in order to eliminate the risk of future fraudulent behavior, to deter others from engaging in fraudulent conduct, and to maintain public confidence in state regulation of the profession. Board Adjudication at 36–37.

We acknowledge that the Board improperly relied upon circumstances described in the SEC Action. However, the circumstances described in the SEC Action differ from the facts established in the PSC Adjudication not in character but only in degree. Without question, both matters involved significant fraudulent conduct. The circumstances in the SEC Action differ in degree because they cover a longer period, involve more money and embrace more victims.

Given the Board's tripartite discipline goals, no abuse of discretion is apparent when the discipline is viewed without the circumstances described in the SEC Action. Thus, considering only the PSC Adjudication, repeated violations occurred over an 11 month period involving at least 21 Pennsylvania residents, for an aggregate amount of at least $292,190. F.F. No. 30. Petitioners and others used a fictitious address in New York as the home address of some Pennsylvania purchasers, and at times a purchaser's Pennsylvania address was concealed. F.F. No. 32. Other practices included misrepresentations, F.F. No. 33, failures to disclose, F.F. No. 33, 34, 35, and dishonest and unethical conduct by which Petitioners took unfair advantage of customers. F.F. No. 40. These acts clearly invite the Board's concern for protecting the public, deterring others and maintaining public confidence in regulation of the profession. Further, the ordered discipline is a reasonable method of advancing these discipline goals.

Additionally, a careful review of the record fails to reveal any proof or argument by Petitioners that they are amenable to rehabilitation or that a lesser discipline option should be considered. Rather, Petitioners raise various legal arguments seeking exoneration. This approach supports our conclusion that the ordered discipline should be affirmed.

## III.

Petitioners next contend the provisions of the CPA Law under which they were charged are so vague as to amount to a violation of their constitutional rights.[23] Petitioners specifically complain the following terms are impermissibly vague: 1) the term "right to practice" as used in 63 P.S. § 9.9a(a)(8) (grounds for discipline in the event of "[s]uspension or revocation of the right to practice before any Federal or State governmental agency"); and 2) the terms "professional" and "standard" as used in 63 P.S. § 9.9a(c)(5) (unprofessional conduct defined as, "failure to comply with any standard promulgated by any recognized public or private standard-setting body that is applicable to the professional service being performed"). Petitioners argue those terms "do not provide a reasonable, ascertainable standard by which the Petitioners were supposed to act" and they are "subject to many different meanings." Petitioners' Brief at 53.

A statute is presumed to be constitutional, and a person challenging the constitutionality of a statute has a heavy burden of persuasion. *South Union Township v. Dep't of Envtl. Prot.*, 839 A.2d 1179 (Pa.Cmwlth.2003). A statute is only found to be unconstitutionally vague when "persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Commonwealth v. Cotto*, 562 Pa. 32, 37, 753 A.2d 217, 220 (2000) (citations omitted). A statute is not unconstitutionally vague if, "the terms, when read in context, are sufficiently specific that they are not subject to arbitrary and discriminatory application." *Id.* at 38, 753 A.2d at 220.

This Court frequently notes that a "legislative enactment will be deemed invalid only if it is so vague and indefinite that courts are unable to determine with any reasonable degree of certainty the intent of the legislative body or so incomplete, conflicting and inconsistent in its provision that it cannot be executed." *Nat'l Assn. of Forensic Counselors v. State Bd. of Soc. Workers, Marriage and Family Therapists and Prof'l Counselors*, 814 A.2d 815, 823, (Pa.Cmwlth.2003) (*quoting McCoy v. Lincoln Intermediate Unit No. 12*, 38 Pa. Cmwlth. 29, 391 A.2d 1119, 1123 (1978)).

Petitioners fail to carry their heavy burden. Although Petitioners complain the terms are "subject to many different meanings", they do not identify those different meanings. Nor do they explain how the terms are so indefinite as to prevent a court from determining legislative intent to any reasonable degree of certainty. As discussed, this Court is able to determine the legislature's intent with reasonable certainty. Accordingly, the challenged terms are sufficiently specific to prevent arbitrary and discriminatory application, and are therefore not unconstitutionally vague.

## IV.

Finally, Petitioners complain the Board commingled its adjudicating and prosecuting functions, thereby violating Petitioners' procedural due process rights. Petitioners point to the following as evidence of the improper commingling: the prosecuting attorney and Board counsel are both em-

---

**23.** Petitioners do not specify the constitutional provisions allegedly violated. Generally, due process protections under both the Federal Constitution and the Pennsylvania Constitution are coextensive. *See Com. v. Scher*, 569 Pa. 284, 803 A.2d 1204 (2002) (plurality); *Com. v. Kratsas*, 564 Pa. 36, 764 A.2d 20 (2001). *See generally* Ken Gormley, Jeffrey Bauman, Joel Fishman & Leslie Kozler, *The Pennsylvania Constitution*, §§ 32.6[c],32.6[h] at 775, 778–79 (2004).

ployed by the Bureau; the prosecuting attorney and Board counsel share the same post-office address; Board counsel, in response to a comment by the prosecuting attorney, stated at the hearing, "Well, I guess, we discussed this off the record prior to the start of the hearing"; no members of the Board were present at the hearing; and no attempt was made to refer the matter to an independent arbiter or administrative law judge. Petitioners also assert Board counsel was biased when he ruled against them in certain evidentiary matters.

The Board counters that attorneys' employment in the same agency is not enough to show an improper commingling. Further, the Board asserts the off-the-record discussion was not an improper exclusive communication, but rather included Petitioners in an exchange regarding evidentiary issues. Finally, the Board argues its counsel's evidentiary rulings were proper and consistent with law.

■■■■■ Due process rights are applicable to hearings before administrative agencies involving substantial property rights, and an individual's right to pursue a profession is such a property right. *Lyness v. State Bd. of Med.*, 529 Pa. 535, 605 A.2d 1204 (1992). Due process considerations caution against a commingling of prosecuting and adjudicating functions, and, "even an *appearance* of bias and partiality must be viewed with deep skepticism." *Id.* at 542, 605 A.2d at 1207 (emphasis in original).

■■■■■ Our Supreme Court acknowledges, however, it is not uncommon for some Commonwealth agencies to fulfill both the prosecutorial and adjudicatory functions. *Id.* at 545, 605 A.2d at 1209 (quoting *State Dental Council and Examining Bd. v. Pollock*, 457 Pa. 264, 271–72, 318 A.2d 910, 914–15 (1974)). Due process requires, "if more than one function is

reposed in a single administrative entity, walls of division be constructed which eliminate the threat or appearance of bias." *Id.* at 546, 605 A.2d at 1209. Further, an appearance of bias must not be focused on the authority granted to a single administrative agency but, rather, focused on the actual process utilized. *Stone and Edwards Ins. Agency, Inc. v. Dep't of Ins.*, 538 Pa. 276, 648 A.2d 304 (1994). "The question of due process reasonably involves an inquiry into the nature of the process *actually* provided." *Id.* at 282, 648 A.2d at 307 (emphasis in original).

Our Supreme Court found a due process violation where the same individuals made the decision to bring formal charges, reviewed the evidence at the hearing, and participated in the decision to impose sanctions. *Lyness.* However, our Supreme Court found no due process violation where only a "potential" for commingling arose from the Insurance Department's handling of prosecuting and adjudicating functions. *Stone and Edwards.* There, our Supreme Court noted,

> Appellants have advanced no claim of actual commingling of functions in the manner in which the Department conducts its investigations, prosecutions and adjudications of insurance law violations. In the absence of any actual commingling, which would give rise to an appearance of bias, partiality or prejudice, Appellants' due process guarantees are being adequately protected.

*Id.* at 283, 648 A.2d at 308.

■■■■■ None of the circumstances Petitioners reference proves an unfair tribunal. Petitioners' proximity complaints are not enough under the *Lyness* standard because it is permissible for the same agency to perform both prosecuting and adjudicating functions. Petitioners did not prove actual commingling. Further, they did not

try to prove that the Board's counsel and the prosecuting attorney were not properly "divided" as required by *Lyness.* Focusing on the actual process provided, we conclude Petitioners failed to carry their burden of proof.

As to the off-the-record discussion, it is unclear who participated. Careful review of the record strongly suggests Petitioners participated. *See* R.R. at 129a, 146a. Additionally, the context within which references appear is significant. In particular, Petitioners did not object, and they did not request to make a record. Under these circumstances, references to an off-the-record discussion do not compel a different result.

Similarly, Petitioners' belated challenge to the manner in which the Board hearing was conducted does not support their claim for relief. Board counsel conducted the hearing, at which a record was made for subsequent review by the Board members. The record does not show that Board counsel sat as a Board member, adjudicated the case or prosecuted the case. Rather, as is customary, he provided legal advice, conducted the hearing, and made evidentiary rulings during the hearing. *See Boulis v. State Bd. of Chiropractic,* 729 A.2d 645 (Pa.Cmwlth.1999); *Lily–Penn Food Stores, Inc. v. Milk Marketing Bd.,* 84 Pa.Cmwlth. 585, 481 A.2d 683 (1983). Moreover, Petitioners did not object to the absence of Board members at any time when this perceived deficiency could be cured. They may not now rely on this circumstance to support a claim of procedural due process deprivation. *See, e.g., Hinkle v. Workers' Comp. Appeal Bd. (Gen. Elec. Co.),* 808 A.2d 1036 (Pa. Cmwlth.2002) (issue waived where failure to timely object deprived hearing officer of opportunity to cure any error).

Finally, Petitioners claim Board counsel showed bias by making certain evidentiary rulings against them. In particular, Board counsel denied admission of Petitioners' evidence on the basis that it was presented for the improper purpose of collaterally attacking findings entered by the PSC. R.R. at 147a–48a. During the hearing, Petitioners claimed they were presenting the evidence for the purpose of rebutting the Commonwealth's evidence. R.R. at 138a. Discussing the findings of the PSC, Petitioners stated, "[T]he findings of fact are basically based upon illusory, I don't even want to call them factual representations. They're allegations that were never supported and denied at all times. There is not one single thread of evidence to show a specific instance of wrong doing in that document." R.R. at 144a–45a.

We discern no error in the evidentiary ruling, because Petitioners are precluded from relitigating the findings made in the proceedings before the PSC. Issue preclusion, also known as collateral estoppel, applies where,

(1) an issue decided in a prior action is identical to one presented in a later action, (2) the prior action resulted in a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action, and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action.

*J.S. v. Bethlehem Area Sch. Dist.,* 794 A.2d 936, 939 (Pa.Cmwlth.2002). Collateral estoppel applies between administrative agencies where the policies and goals underlying the matter are the same in both proceedings. *Callaghan v. Workers' Comp. Appeal Bd. (City of Phila.),* 750 A.2d 408 (Pa.Cmwlth.2000).

Here, the first three elements of collateral estoppel are easily met. First, the

issue Petitioners sought to relitigate by introducing the disputed evidence was the same issue before the PSC. In other words, Petitioners sought to prove they did not violate the Pennsylvania Securities Act, an issue decided by the PSC. Second, the PSC entered judgment on the issue, which became final when Petitioners failed to appeal. Third, Petitioners were parties in the PSC action.

■ The only element requiring discussion is whether Petitioners had a full and fair opportunity to litigate the issue before the PSC, where judgment was entered by consent rather than after a hearing. Although a matter of some disagreement among jurisdictions, in Pennsylvania a judgment entered by consent "binds *the parties* with the same force and effect as if a final decree has been rendered after a full hearing on the merits." *Zampetti v. Cavanaugh,* 406 Pa. 259, 265, 176 A.2d 906, 909 (1962) (emphasis in original); *see also Pennsylvania Human Relations Comm'n v. Ammon K. Graybill, Jr., Inc., Real Estate,* 482 Pa. 143, 148, 393 A.2d 420, 422 (1978) ("A consent decree has a Res judicata effect, binding the parties with the same force and effect as a final decree rendered after a full hearing on the merits."). As our Supreme Court noted, "The fact that without the consent of the parties the court might not have rendered the judgment does not affect its effect as res judicata. Were this not so, a consent decree would have little value." *Zampetti,* 406 Pa. at 265, 176 A.2d at 909.

Here, Petitioners concede they had the opportunity to litigate before the PSC, but chose not to.[24] Petitioners state they agreed to settle the PSC action "solely for purposes of concluding other ongoing and protracted proceedings." Petitioners' Brief at 18. However, Petitioners are bound by the PSC Adjudication to the same extent they would have been if they had chosen to litigate before the PSC rather than enter into a consent judgment.

We also conclude the policies and goals underlying the Pennsylvania Securities Act and the CPA Law are the same. Both statutes specifically prohibit fraudulent practices. *Compare* Part IV of the Pennsylvania Securities Act, 70 P.S. §§ 1–401—1–410, *with* Sections 9.1 and 12 of the CPA Law, 63 P.S. §§ 9.9a, 9.12. Both statutes require registration or licensure for professionals. *Compare* Part III of the Pennsylvania Securities Act, 70 P.S. §§ 1–301—1–305, *with* Sections 8.2[25] and 8.8[26] of the CPA Law, 63 P.S. §§ 9.8b, 9.8h. Also, both statutes authorize disciplinary actions, and civil and criminal sanctions as methods of regulating professional responsibility and protecting the public. *Compare* Part V of the Pennsylvania Securities Act, 70 P.S.

---

**24.** At the hearing, Kenneth was questioned by the prosecuting attorney,

MS. GUILFOYLE: And that was, you had, did you have the option of having them litigated? Could you have gone forward rather than accept the offer of settlement made by the PSC? Did you have the option of litigating this case?

MR. KENNETH SHAPIRO: Oh, yes.

R.R. at 152a–53a. A similar exchange occurred later during the hearing, concerning whether a hearing was scheduled on the PSC action:

MS. GUILFOYLE: So there was, in fact, a hearing scheduled.

MR. KENNETH SHAPIRO: It appears from the record that I've created, yes.

MS. GUILFOYLE: But you chose not to pursue that avenue but rather to accept the offer of settlement?

MR. KENNETH SHAPIRO: With restrictions.

R.R. at 198a–199a.

**25.** Added by Act of September 2, 1961, P.L. 1165.

**26.** Added by Act of December 4, 1996, P.L. 851.

§§ 1–501—1–514, *with* Sections 9, 14, and 15 of the CPA Law, 63 P.S. §§ 9.9, 9.14, 9.15. Moreover, as discussed before, the CPA Law includes as a ground for discipline "revocation of the right to practice before and Federal or State governmental agency." 63 P.S. § 9.9a(8). This provision supports our conclusion that the policies and goals of the CPA Law are the same as those of other laws regulating professional practice, including the Pennsylvania Securities Act.

Accordingly, collateral estoppel applies between the PSC and the Board, and Petitioners are collaterally estopped from relitigating the facts underlying the PSC Adjudication. Board counsel neither erred nor demonstrated bias by precluding Petitioners' proof.

For the reasons set forth herein, we affirm the Board's order.

### *O R D E R*

AND NOW, this 26th day of July, 2004, the order of the State Board of Accountancy in the above-captioned matter is affirmed.