**R.L. INSULATION CO., INC., Ronald L. Lundquist, and Robin K. Lundquist, Petitioners**

v.

**PREVAILING WAGE APPEALS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 9, 2007.

Decided May 8, 2007.

Thomas R. Davies, Lancaster, for petitioners.

Peter Von Getzie, Asst. Counsel, Harrisburg, for intervenor, Bureau of Labor Law Compliance.

BEFORE: COLINS, Judge, McGINLEY, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

R.L. Insulation Co., Inc., Ronald L. Lundquist, and Robin K. Lundquist (hereafter collectively referred to as Appellants) petition for review of the decision and

order of the Pennsylvania Prevailing Wage Appeals Board (Board), affirming the adjudication and order of the Secretary of the Department of Labor and Industry. In his order, the Secretary concluded that Appellants had intentionally violated the Pennsylvania Prevailing Wage Act (Act)[1] by failing to pay the prevailing wages due their workers on certain public works projects and debarred Appellants from contracting for any further such projects for a period of three years. We now affirm.

R.L. Insulation Company, Inc. is a corporation located in Hopewell, Pennsylvania, and has been in business for seventeen years. Approximately half of their work involves prevailing wage projects. In 2002, the Department of Labor and Industry's Bureau of Labor Law Compliance (the Bureau) began an investigation of one of Appellants' projects for the Norwin School District.[2] This investigation was conducted by Tim Driscoll, an investigator for the Bureau. During the course of this investigation, Robin Lundquist provided Mr. Driscoll with a copy of a letter that she had sent to another Bureau investigator dated January 20, 2000, outlining what she believed to be laborers' tasks on a prevailing wage job.[3]

Upon review of this letter, Mr. Driscoll advised Ms. Lundquist that many of the tasks identified as laborers' tasks were actually insulators' tasks. Mr. Driscoll instructed Ms. Lundquist that workers must be paid according to the tasks performed and that their timecards must accurately reflect the nature of the work performed at the job site. As a result of the aforementioned investigation, the Bureau determined that two of Appellants' workers at the Norwin School District project were paid less than the prevailing wage rates for the work they performed. The Bureau and Appellants entered into a settlement agreement regarding these underpayments. Pursuant to the settlement agreement, the underpaid workers received compensation which essentially amounted to a 6:2 payment ratio, six hours at the insulators' rate and two hours at the laborers' rate. However, Mr. Driscoll never informed Appellants that it was acceptable to continue to pay their workers at this ratio.

Subsequent to this settlement agreement, in June of 2002, Appellants changed their method of record keeping and new timecards were introduced to the workers. The new timecards delineated codes for actual tasks performed. The duties and corresponding codes were strikingly similar to the duties which Ms. Lundquist had described in her January 20, 2000, letter. Appellants held two meetings to explain the new timekeeping procedures, one for insulators and one for field employees. At the first meeting, the insulators were advised that they were continuing at their full insulators' rate and were asked to send as much laborers' tasks as they could to the newer employees on the job. At the second meeting, the field employees were

---

1. Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. §§ 165–1–165–17.

2. At the time of this investigation, Appellants were involved in approximately twenty other public works projects.

3. This letter identified eleven separate tasks, including the following: unloading truck upon arrival at job site; carrying material from truck or storage area to specific job site within building; working as ground man for insulator by cutting materials to size; picking up debris; moving tools, ladders and scaffolding from place to place; loading excess material back on truck; moving material between storage areas; sorting materials to proper sizes; mixing cement for installer; building scaffolding; and returning to warehouse for materials or traveling to local hardware store for tools and supplies.

told to total up their laborers' tasks for the day and record the same in the laborers' column of their timecard, with the remainder of their day qualifying at the insulators' rate.

In October of 2003, the Bureau began another investigation of Appellants after receiving five written complaints filed against Appellants by former workers. This investigation was conducted by Bureau investigator Salvatore Piccillo. The investigation involved sixteen public works projects in which Appellants were subcontractors. The insulators' rates for these projects were determined in accordance with union collective bargaining agreements and were not challenged. By letter dated October 14, 2003, Mr. Piccillo sent a letter to Appellants advising them of the investigation and requesting certain documentation, including employee timecards, payroll ledgers, cancelled payroll checks and certified payroll records.

Upon receipt of the requested information, Mr. Piccillo initiated an audit and also arranged to meet with each of the five workers who had filed written complaints with the Bureau. Mr. Piccillo did in fact meet with these workers over a five-month period from January to May of 2004. Each of these workers had similar complaints regarding Appellants, i.e., although they were performing only insulation work eight hours a day on the projects, they were being paid at a 2:6 or 4:4 ratio. Each of the workers further complained that their timecards did not reflect the actual work that was being performed.

During an initial meeting with Mr. Piccillo and his supervisor, Joseph Hickey, in March of 2004, Appellants explained the company's "training program," whereby an inexperienced worker initially is paid at a 2:6 ratio (two hours insulators' rate and six hours laborers' rate), then progresses to a 4:4 ratio (four hours insulators' rate and four hours laborers' rate) and finally reaches a 6:2 ratio (six hours insulators' rate and two hours laborers' rate). Appellants also indicated to Mr. Piccillo that very few workers are paid strictly eight hours at the insulators' rate.

Mr. Hickey thereafter advised Appellants that their "training program" was not appropriate for prevailing wage projects and suggested that they consider an apprenticeship program instead. Ronald Lundquist, however, strongly objected to this suggestion. Mr. Hickey proceeded to inform Appellants that, based upon the worker complaints and subsequent statements, he saw no alternative but to compile an audit spreadsheet in such a fashion that all hours are classified at the insulators' rate. Following the meeting, Mr. Piccillo performed an audit of Appellants' records and compiled his results into spreadsheets for each project in accordance with Mr. Hickey's instructions. This audit resulted in a combined underpayment to forty-five of Appellants' workers in the amount of $165,690.39.

On December 13, 2004, the Bureau issued an order to show cause charging Appellants with intentionally failing to pay their workers the predetermined prevailing minimum wage rates for the aforementioned sixteen public works projects. Appellants filed an answer and the case was assigned to a hearing officer.[4] The hear-

---

4. As of July 14, 2003, the Secretary had authorized the hearing officer to act as his representative to preside at hearings, adjudicate cases and execute and issue final adjudications on his behalf with respect to enforcement matters under Section 11 of the Act, 43 P.S. § 165–11. However, on August 2, 2005, the Secretary rescinded the delegation as it pertained to final adjudications and requested that the hearing officer merely prepare draft adjudications and orders for his review and approval.

ing officer conducted hearings in this matter on June 20 and 21, 2005. At these hearings, the Bureau presented the testimony of four of the five employees who had filed complaints with the Bureau against Appellants, including Todd Goldizen, Steven Conner, Brian Little and Barry Wertz.

Mr. Goldizen testified that he worked as an insulator for Appellants for approximately eight years, from 1996 to 2004, at which time he was fired. Despite the fact that he initially performed insulating work for Appellants, Mr. Goldizen indicated that his first paychecks were at the "[s]traight laborer's rate," meaning he was paid eight hours at said rate. (R.R. at 266a). Mr. Goldizen also indicated that over time, and based on his on the job experience, his rate increased to two hours at the insulators' rate, then four hours and finally six hours. Nevertheless, Mr. Goldizen noted that he was paid these rates regardless of the type of tasks he had performed.

Mr. Goldizen proceeded to discuss Appellants' change in timecards in 2002. Mr. Goldizen indicated that at the meetings following this change, Appellants advised their employees that "Labor & Industry [was] digging into [Appellants'] books" and that the new timecards were necessary to "keep a good thing going" and to "keep your paycheck rolling in." (R.R. at 279a). Despite this change, Mr. Goldizen indicated that his pay rate remained the same and that he just had to find a code/reason which would justify payment of the laborers' rate for a specified number of hours.[5] In other words, Mr. Goldizen indicated that the timecards did not actually reflect the work that he was performing at a particular project. In fact, Mr. Goldizen indicated that he was advised by either Mr. Lundquist or his supervisor, Darryl

Melius, that Appellants never wanted to see a timesheet reflecting an entire day at the insulators' rate.

On cross-examination, Mr. Goldizen denied that such duties as loading the truck at the end of the day, cleaning up and building scaffolding were laborers' tasks. Mr. Goldizen acknowledged that he complained about the timecards to his supervisor but indicated that his chief complaint was having to fill them out himself. With respect to a disputed timecard, Mr. Goldizen denied that there was a question of the hours adding up, insisting that Appellants questioned his increase in the number of hours he reported at the insulators' rate.

Mr. Conner was next to testify. Mr. Conner indicated that he worked for Appellants for approximately two years, beginning in 2000. During his interview with Mr. Lundquist, Mr. Conner stated that he was informed that he would initially receive "two and six" for prevailing wage work, meaning two hours at the insulators' rate and six hours at the laborers' rate. (R.R. at 308a). Nevertheless, Mr. Conner noted that he gradually increased his prevailing wage rate to four and four and recorded his hours according to this pay scale even though he performed insulators' duties the majority of the time that he was working. After leaving his job with Appellants, Mr. Conner filed a complaint with the Bureau.

Mr. Little was next to testify. Mr. Little indicated that he worked for Appellants for approximately nine months from April to December of 2002. Mr. Little conceded that he never did insulators' work before he was hired by Appellants and was not aware of the pay scales relative to prevailing wage projects. Despite primarily performing insulators' work for Appellants,

---

**5.** Mr. Goldizen described this process as having to "eat your laborer's time up with the codes according to what Labor & Industry wanted to see." (R.R. at 277a).

Mr. Little noted that he was paid at the laborers' rate for all of his hours worked.[6]

The final former employee of Appellants to testify was Mr. Wertz. Mr. Wertz indicated that he worked for Appellants for approximately six years. During his interview with Mr. Lundquist, Mr. Wertz stated that he was informed that he would initially receive "two and six" for prevailing wage work, meaning two hours at the insulators' rate and six hours at the laborers' rate. (R.R. at 344a). Mr. Wertz conceded that he was a general contractor before being hired by Appellants and that he had never previously performed insulators' work. Nevertheless, Mr. Wertz indicated that, although the majority of the work he performed on Appellants' prevailing wage projects was insulators' work, he was paid according to a rate scale, initially receiving "two and six" as noted above and gradually progressing to "four and four" and eventually to "six and two." (R.R. at 344a, 347a, 348a). In fact, Mr. Wertz stated that he was paid these rates even though the job tasks he was performing for Appellants essentially remained the same. Mr. Wertz acknowledged that his employment with Appellants was terminated following a "pretty nasty argument" with Mr. Lundquist. (R.R. at 349a).

The Bureau next presented the testimony of Robert O'Brien, the director of the Bureau. Mr. O'Brien explained that he oversees the activities of the Bureau's apprenticeship and training council. Mr. O'Brien explained that employers can contact the Bureau regarding the establishment of an apprenticeship program, after which the council provides a representative to meet with an employer and provide it with information regarding the set up of such a program. After a program is established, the council considers approval of

the same and continues with monitoring. Under such a program, the apprentices are registered with the Bureau and paid a percentage that gradually increases over time, usually for a period of four to five years.

As to Appellants, Mr. O'Brien indicated that the Bureau had received numerous complaints from former workers, which complaints he assigned to Mr. Hickey, who in turn assigned the complaints to an investigator, Mr. Piccillo. In late December of 2003 or early January of 2004, Mr. O'Brien indicated that he received a call from Mr. Lundquist and that Mr. Lundquist attempted to explain Appellants' on-the-job training program to him. However, Mr. O'Brien noted that no such program was permitted under the Act and that employees on prevailing wage jobs were to be paid the appropriate rate for the actual work performed. On cross-examination, Mr. O'Brien acknowledged that Appellants had previously entered into a settlement agreement with the Bureau regarding a prior project. Mr. O'Brien would not concede that said settlement involved a specified number of hours paid at the laborers' rate.

The Bureau next presented the testimony of A. Robert Risaliti, an administrative law office for the Bureau. Mr. Risaliti indicated that his responsibilities included ensuring that the predetermined wage rates are sent to the awarding authority. Mr. Risaliti also indicated that he is involved with enforcement proceedings under the Act and that, based upon his thirty years of experience, he was quite familiar with the custom and usage in the trades. Mr. Risaliti noted that the insulators' duties are similar throughout the state. As to the general duties of laborers, Mr.

---

6. This rate of payment is confirmed by the certified payroll records that Appellants were

required to submit to the Bureau. *See* R.R. at 4261a, 4552a.

Risaliti described the same as unloading trucks, cleaning up, mixing mortar and building scaffolding. With respect to a project involving insulators, Mr. Risaliti explained that a laborers' duties are limited to unloading trucks and maybe cleaning up a work area. Mr. Risaliti further noted that other than the apprenticeship program, an employer is not permitted to pay an employee on a prevailing wage project anything other than the corresponding rate for skilled workers or laborers'.

On cross-examination, Mr. Risaliti noted that when questions arise as to proper classification of a job task, he looks to custom and usage in the industry as well as the Dictionary of Occupational Titles in order to reach a determination. However, Mr. Risaliti could not recall any such classification questions on the projects at issue in the present case. As to scaffolding work, Mr. Risaliti indicated that insulators do their own scaffolding at a job site.

The Bureau next presented the testimony of Robert Norcross, a retired union insulator who worked in the industry for thirty-three years. Mr. Norcross indicated that insulators' work is very specific and without training, the tasks associated with such work could not be performed by a laborer. Mr. Norcross described the duties of an insulator as including, *inter alia*, fabrication, alteration, application, assembly, spraying, molding, mixing, hanging, removal, retrofitting, maintenance, repair, clean-up, fireproofing and occasional welding. Mr. Norcross later testified that insulators handle and unload their own material, mix their own cement and build their own scaffolding. On cross-examination, Mr. Norcross conceded that there was no document to look at to determine when a scaffolding is too high to be erected by the insulator himself. Mr. Norcross also indicated that he was aware of problems between Appellants and the insulators' union.

The Bureau next presented the testimony of Joe Wingert, an organizer with a local laborers' union and a prior construction laborer for eighteen years. Mr. Winger indicated that laborers' tasks are similar throughout the state and are dependent on what type of contractor a laborer is working with. Generally, on a prevailing wage project, Mr. Wingert noted that a laborer performs clean-up work, safety work, unloading trucks, raking concrete and moving materials. When working with insulators, Mr. Wingert indicated that laborers do not build scaffolding, do not unload trucks, do not assist with tasks, do not retrieve materials, do not cut metal and do not mix cement. Finally, Mr. Wingert noted that the laborers have their own apprenticeship program. On cross-examination, Mr. Wingert conceded that many of the tasks are performed by insulators themselves because it would not be efficient to hire a laborer to perform such a task for only fifteen to thirty minutes at a time. Further, Mr. Wingert noted that during his previous work as a construction laborer, he never worked directly with insulators.

The Bureau next presented the testimony of Mr. Hickey, supervisor of the Bureau's Scranton District Office. Prior to his appointment as supervisor, Mr. Hickey was a Bureau investigator primarily focused on prevailing wage violations. Additionally, Mr. Hickey had worked as a pipe welder for approximately eighteen years. Mr. Hickey described the investigation of Appellants and the assignment of the same to Mr. Piccillo. Mr. Hickey detailed the meeting in March of 2004, between himself, Mr. Piccillo, Mr. Lundquist and Ms. Lundquist.[7] At this meeting, Mr. Hickey

7. Mr. Hickey identified Ms. Lundquist as the daughter of Mr. Lundquist.

indicated that he specifically advised Mr. Lundquist that Appellants' training program was not acceptable. After reviewing the gathered information with Mr. Piccillo, Mr. Hickey noted that he saw no alternative but to classify all hours at issue at the insulators' rate and to recommend an intentional violation to the Bureau's Director.

On cross-examination, Mr. Hickey conceded that Appellants were generally cooperative in providing any requested information. Mr. Hickey also acknowledged that he participated in meetings with the former workers who had filed complaints against Appellants and that these workers did discuss the fringe benefits they received as part of their employment. Further, Mr. Hickey acknowledged that these workers did perform laborers' duties in the nature of clean-up for very limited amounts of time during the projects at issue. As to Appellants' prior settlement agreement in 2002, Mr. Hickey described the same as a settlement for a specific dollar amount and not a concession from the Bureau to the classification of certain hours at the insulators' rate and certain hours at the laborers' rate.

Finally, at the second hearing in this matter, the Bureau presented its last witness, Mr. Piccillo. Mr. Piccillo essentially reiterated the nature of the investigation described above by Mr. Hickey. As did Mr. Hickey, Mr. Piccillo characterized Appellants as very cooperative throughout the investigation. Most importantly, Mr. Piccillo indicated that the investigation confirmed the former workers' complaints that their timecards did not reflect the work actually performed but instead reflected a set ratio established by Appellants.

On cross-examination, Mr. Piccillo again stated that Appellants had been cooperative throughout the investigation. Mr. Piccillo acknowledged that during the investigation, he did discover a number of employees that were paid at the full insulators' rate and he included those employees in his audits. Mr. Piccillo also acknowledged that during interviews with the former workers, these workers identified receipt of fringe benefits from Appellants. Although Mr. Piccillo indicated that the Bureau's website contains information as to how to classify certain types of work, he did not know when that information was placed on the website and if it was available to Appellants during the time of the projects in question herein. Prior to the website, Mr. Piccillo noted that a contractor could simply call the main office in Harrisburg with a classification question.

Following the conclusion of the Bureau's witnesses, Appellants first presented the testimony of Ms. Lundquist. Ms. Lundquist noted that she was Appellants' corporate secretary responsible for "[f]inancials, paperwork, payroll." (R.R. at 6437a). With regard to her January 20, 2000, letter to another Bureau investigator outlining what she believed to be laborers' tasks on a prevailing wage job, Ms. Lundquist indicated that while she stated therein that she was receptive to any input, she received no reply to that letter. With respect to the prior settlement agreement in 2002, Ms. Lundquist noted that the same did not involve payment of all time at the insulators' rate and that she was never informed that Appellants could not use laborers on their prevailing wage projects.

Subsequent to this agreement, Ms. Lundquist indicated that Appellants revised their timecards such that employees could specifically record the amount of time they spent performing laborers' and insulators' duties. In follow-up meetings with employees, Ms. Lundquist and Mr. Melius discussed the new timecards and noted no complaints. Ms. Lundquist pro-

ceeded to note the various fringe benefits provided to employees, including hospitalization, cancer insurance, holiday pay and vacation pay.

On cross-examination, Ms. Lundquist acknowledged that she reviewed her January 20, 2000, letter to another Bureau investigator with Mr. Driscoll point by point and that he advised her which tasks he believed to be laborers' tasks and which he believed to be insulators' tasks, after which Appellants and the Bureau entered into the settlement agreement. Nevertheless, Ms. Lundquist acknowledged that Mr. Driscoll never informed her that it was appropriate to pay workers at a 6:2 ratio. In fact, after this agreement, Ms. Lundquist conceded that she understood that workers should not be paid according to such a ratio. With respect to the new timecards, Ms. Lundquist denied that the workers continued to be paid at a 6:2 ratio and insisted that they were paid in accordance with the work they performed and recorded on their timecards. Ms. Lundquist further conceded that prior to the new timecards, workers were paid according to a set ratio based upon experience and that the timecards at that time did not accurately reflect the work performed.

Appellants next presented the testimony of Mr. Lundquist, Appellants' owner and president. Mr. Lundquist discussed his extensive experience in the industry and Appellants' operating procedure. Mr. Lundquist denied being present at either of the two meetings with employees following introduction of the new timecards. Mr. Lundquist denied ever telling a worker not to accurately record his time. Rather, Mr. Lundquist indicated that a worker was paid according to the time and task as recorded on his timecard.

On cross-examination, Mr. Lundquist acknowledged that in all the time prior to starting his own business, when he worked in the insulation industry, he was never paid at the laborers' rate. As did Mr. Wingert, Mr. Lundquist indicated that it simply would not be cost efficient or practical to bring a laborer to an insulating job. Mr. Lundquist detailed Appellants' earlier training program and the ratio system by which workers were paid. However, Mr. Lundquist noted this program no longer exists and that Appellants pay their workers pursuant to the new timecard system.

Appellants next presented the testimony of Mr. Melius, a superintendent. Following the aforementioned settlement agreement in 2002, Mr. Melius discussed the new timecards and the subsequent meetings with workers. Mr. Melius noted that Mr. Lundquist was not present at these meetings. At these meetings, Mr. Melius indicated that workers were instructed to specify the type of tasks they performed for the day and the amount of time spent at each respective task. Mr. Melius denied ever instructing a worker not to fill out a timecard accurately or warning a worker that he would be fired if the timecard was not filled out properly. On cross-examination, Mr. Melius again denied warning any worker regarding the proper completion of their timecard.

Finally, Appellants presented the testimony of Daryl Detwiler, an employee of seventeen years and currently a foreman. Mr. Detwiler noted that he was present for the first meeting regarding the new timecards. Mr. Detwiler also testified that Mr. Lundquist was not present for this meeting. Mr. Detwiler indicated that he never asked any worker to change his timecard and never informed any worker that he was not recording enough hours at the laborers' rate.

Following these hearings, on November 3, 2005, the Secretary issued an adjudication and order concluding that Appellants had intentionally failed to pay the prevail-

ing wages due to workers on the projects at issue. The Secretary noted that Mr. Lundquist and Ms. Lundquist had admitted to classifying their workers based upon experience as opposed to the work that was actually performed. The Secretary concluded that such payment practices continued after the 2002 settlement agreement "under the guise of a new timecard that contained 'Codes for Laborers Duties' that are strikingly similar to the list of laborers duties that Driscoll discussed with Lundquist, point by point" prior to this agreement. (Secretary's Adjudication at 27). The Secretary thereafter declared Appellants to be debarred and prohibited from the award of any public works contract for a period of three years. Further, the Secretary noted that the Office of Attorney General could proceed to recover penalties and statutory liquidated damages in the amount of $165,690.39.

By opinion and order dated October 2, 2006, the Board affirmed the adjudication and order of the Secretary. In its decision and order, the Board rejected Appellants' argument that the Secretary's adjudication was not supported by substantial evidence and that his findings were biased in favor of the Bureau. As to any attack on the credibility of the testimony of Appellants' former workers on the basis of bias, the Board noted that it was bound by the Secretary's credibility determinations. The Board also rejected any argument by Appellants that they had not intentionally violated the Act, citing Appellants' use of a training program incorporating preset ratios as well as the continued use of these ratios under the guise of a new timecard system. Further, the Board rejected Appellants' argument that the Act was unconstitutionally vague in failing to define the activities performed by the respective crafts or classifications. Finally, the Bureau rejected Appellants' argument that the Secretary erred in accepting the union witnesses, Mr. Norcross and Mr. Wingert, as expert witnesses. Appellants thereafter filed a petition for review with this Court. The Bureau then filed a notice of intervention. The Board did not participate in this appeal.

■■■ On appeal,[8] Appellants first argue that the Secretary's adjudication was not supported by substantial evidence. We disagree.

Section 11(h)(1) of the Act provides that the following "shall constitute substantial evidence of intentional failure to pay prevailing wage rates ... (1)[a]ny acts of omission or commission done willfully or with a knowing disregard of the rights of workmen resulting in the payment of less than prevailing wage rates." 43 P.S. § 165–11(h)(1). In this regard, we have previously held that false certification to payment of the prevailing wage as well as advising workers to lie to Bureau investigators can constitute evidence of an intentional violation. *See Fiore v. Department of Labor and Industry, Prevailing Wage Appeals Board,* 526 Pa. 282, 288, 585 A.2d 994, 998 (1991) (citing *Dale D. Akins, Inc. v. Department of Labor and Industry,* 16 Pa.Cmwlth. 191, 329 A.2d 869 (1974)); *Duffy v. Department of Labor and Industry, Prevailing Wage Division,* 160 Pa. Cmwlth. 140, 634 A.2d 734 (1993).

8. Our scope of review of the Board's decision is limited to determining whether constitutional rights were violated, an error of law was committed and whether necessary findings of fact were supported by substantial evidence. *Department of Labor and Industry,* *Bureau of Labor Law Compliance v. Lawson Demolition and Hauling Co.,* 856 A.2d 860 (Pa.Cmwlth.2004), *petition for allowance of appeal denied,* 583 Pa. 697, 879 A.2d 783 (2005).

■ Appellants place heavy emphasis on the fact that the evidence relied upon by the Secretary in reaching his decision included the testimony of four of their former, disgruntled workers, which was contradicted by the testimony of their own witnesses. In essence, Appellants are disputing the Secretary's credibility determinations. However, the law is well settled that the Secretary is the ultimate finder of fact in these matters and is free to accept or reject the testimony of any witness, even if uncontradicted. *Boss Insulation & Roofing, Inc. v. Department of Labor and Industry,* 722 A.2d 778 (Pa.Cmwlth.1999); *York Excavating Company, Inc. v. Pennsylvania Prevailing Wage Appeals Board,* 663 A.2d 840 (Pa.Cmwlth.1995). Moreover, the presence of conflicting evidence in the record does not mean that substantial evidence is lacking. *DiLucente Corporation v. Pennsylvania Prevailing Wage Appeals Board,* 692 A.2d 295 (Pa.Cmwlth. 1997).

The testimony relied upon by the Secretary is thoroughly summarized above and need not be restated herein. Suffice it to say, this testimony constitutes substantial evidence in support of the Secretary's conclusion that Appellants had intentionally violated the Act.[9]

■ Next, Appellants argue that the Act was unconstitutionally vague regarding the appropriate classification of laborers' work such that the Secretary violated their right to due process by finding an intentional violation of said Act. Again, we disagree.

Section 3 of the Act provides that "[t]he specifications for every contract for any public work to which any public body is a party, shall contain a provision stating the minimum wage rate that must be paid to the workmen employed in the performance of the contract." 43 P.S. § 165–3. Section 5 of the Act, 43 P.S. § 165–5, prohibits contractors from paying anything less than the prevailing minimum wages with regard to a public works project. Section 6 of the Act, 43 P.S. § 165–6, outlines the duty of a contractor to keep accurate records of the name, craft and actual hourly rate paid to each worker on such a project. Section 11(a) of the Act, 43 P.S. § 165–11(a), provides that if a public body discovers that a contractor has failed to pay the appropriate prevailing wages, the public body is required to notify the Secretary of the same in writing.

Thereafter, pursuant to Section 11(c) of the Act, 43 P.S. § 165–11(c), the Secretary is required to conduct an investigation, including a hearing. In the event that the Secretary concludes that the contractor's actions in failing to pay the prevailing wage rates was intentional, Section 11(e) of the Act, 43 P.S. § 165–11(e), provides that the contractor shall be prohibited from the award of any public works contract for a period of three years. This Section also permits the Attorney General to seek to recover penalties for such intentional violations.

■ We note that a statute is presumed to be constitutional and a party challenging the constitutionality of a statute has a heavy burden of persuasion. *Shapiro v. State Board of Accountancy,* 856 A.2d 864 (Pa.Cmwlth.2004), *petition for allowance of appeal denied,* 582 Pa.

---

9. In the course of this argument, Appellants further argue that the Secretary's decision was capricious as he "deliberately ignored evidence of work classification that a reasonable person would consider important." (Brief of Appellants at 26). We cannot agree with Appellants. To the contrary, the Secretary thoroughly and adequately summarized and discussed the evidence/testimony presented before the hearing officer in his adjudication, including evidence/testimony related to job classifications.

712, 872 A.2d 174 (2005). With respect to a "void for vagueness" challenge, we noted in *Meade v. Department of Transportation, Bureau of Driver Licensing*, 813 A.2d 937, 941 (Pa.Cmwlth.2002), that to survive such a challenge "the statute must be written in a manner which affords an ordinary person fair notice of what conduct is prohibited and describes the prohibited conduct in a manner that does not encourage arbitrary or discriminatory enforcement." (Citing *Commonwealth v. Mikulan*, 504 Pa. 244, 252, 470 A.2d 1339, 1343 (1983)). In this case, Section 5 of the Act prohibits contractors from paying anything less than the prevailing minimum wages set for a public works project, said wages being based on the classification of work that an individual is performing.

Admittedly, neither the Act nor its regulations provide a specific definition of what tasks constitute laborers' tasks on any given prevailing wage project. Rather, the regulations define "classification" as "[s]pecific categories of jobs which are performed within a 'craft' as defined in this section." 34 Pa.Code § 9.102. "Craft," in turn, is defined by these regulations as "[s]pecial skills and trades which are recognized as such by custom and usage in the building and construction industry." *Id.* In this regard, we have repeatedly upheld this "custom and usage" standard. *See, e.g., Leonard S. Fiore, Inc. v. Department of Labor and Industry, Prevailing Wage Appeals Board*, 129 Pa.Cmwlth. 583, 566 A.2d 632 (1989), *reversed on other grounds*, 526 Pa. 282, 585 A.2d 994 (1991); *Jackard Construction Company, Inc. v. Pennsylvania Prevailing Wage Appeals Board*, 43 Pa.Cmwlth. 565, 403 A.2d 618 (1979); *Department of Labor and Indus-*

*try v. Altemose Construction Company*, 28 Pa.Cmwlth. 277, 368 A.2d 875 (1977).[10]

Moreover, in the present case, Appellants' violation of the Act was not the result of the Act's silence with respect to a specific definition of laborers' tasks. Instead, Appellants' violation of the Act was premised upon their utilization of set ratios for prevailing wage projects, regardless of the work being performed, and their continued use of these ratios under the guise of a new timecard system after being advised by Bureau representatives that the same was improper.

Thus, we cannot say that the Act was unconstitutionally vague regarding the appropriate classification of laborers' work such that the Secretary violated Appellants' right to due process by finding that it had intentionally violated said Act.

■ Finally, Appellants argue that the Board erred in affirming the Secretary's adjudication and order as the Secretary improperly considered the testimony of union witnesses Mr. Norcross and Mr. Wingert as expert witnesses when they had irrelevant experience. Once more, we disagree.

Our Supreme Court addressed the issue of expert witnesses in *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525 (1995), wherein the Court stated as follows:

> The standard for qualifications of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine. It

---

**10.** In our decision in *Fiore*, 566 A.2d at 637, we rejected an argument from an experienced public works contractor, identical to the current argument raised by Appellants, as "specious."

is also well established that a witness may be qualified to render an expert opinion based on training and experience. Formal education on the subject matter of the testimony is not required ... It is not a necessary prerequisite that the expert be possessed of all of the knowledge in a given field, only that he possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience.

*Id.*, 541 Pa. at 480–481, 664 A.2d at 528 (Citations omitted).

■ Additionally, we have previously held that a hearing tribunal "has wide discretion in deciding whether to allow the admission of expert testimony into evidence, which decision is not subject to reversal absent a clear abuse of discretion." *See Marx Stationery and Printing Company v. Redevelopment Authority of the City of Philadelphia*, 675 A.2d 769, 777 (Pa.Cmwlth.1996). Further, we held in *Marx Stationery* that "the threshold for qualifying as an expert is deliberately set low, so that if the witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his [testimony] is for the [hearing tribunal]." *Id.* (Citation omitted).[11]

Contrary to Appellants' argument, we believe the trial court properly considered Mr. Norcross and Mr. Wingert as expert witnesses with sufficient knowledge of a workers' duties and obligations relating to insulators and laborers. Mr. Norcross tes-tified that he had been a union insulator for thirty-three years before retiring in February of 2005. Mr. Norcross noted that the terms of his employment were routinely covered by the union's collective bargaining agreements with various contractors. Additionally, Mr. Norcross indicated that he worked as a foreman superintendent and general foreman at different job sites, was an instructor in the joint apprenticeship and training school for insulators, was an instructor in the asbestos abatement school and served both as a business manager and president of a local union. In these latter roles, Mr. Norcross stated that was responsible for negotiating and enforcing the collective bargaining agreement between the union and the Insulation Contractors' Association. Further, Mr. Norcross indicated that the insulators' tasks are consistent throughout the Commonwealth.

Mr. Winger testified that he was an organizer for a local laborers' union for approximately two years and had previously worked for eighteen years as a construction laborer. Mr. Wingert noted his familiarity with the duties of a laborer as encompassed in the union's collective bargaining agreements. Mr. Wingert indicated that the tasks of a construction laborer were similar throughout the Commonwealth, noting that he had traveled and worked in such areas as Allentown, Williamsport, Scranton, Harrisburg, Chambersburg and Philadelphia. Based upon Mr. Norcross' and Mr. Wingert's [12]

---

11. Moreover, we note that the proceedings before the Secretary and his hearing officer were administrative proceedings, which are subject to more relaxed evidentiary standards. *See, e.g., Edwards v. Workers' Compensation Appeal Board (MPW Industrial Services, Inc.)*, 858 A.2d 648 (Pa.Cmwlth.2004). Additionally, these liberal rules of evidence relating to administrative agencies give such agencies broad discretion in admitting or excluding evidence. *See Leeward Construction, Inc. v. Department of Environmental Protection*, 821 A.2d 145 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 573 Pa. 706, 827 A.2d 431 (2003).

12. In the course of this argument, Appellants raise an issue concerning the knowledge of these witnesses being limited to certain geo-

significant experience in their respective fields as well as their association and service to their respective local unions, we agree with the Board that neither the hearing officer nor the Secretary erred in permitting these witnesses to testify as expert witnesses.

Accordingly, the order of the Board is affirmed.

### *ORDER*

AND NOW, this 8th day of May, 2007, the order of the Prevailing Wage Appeals Board is hereby affirmed.

graphical areas within the Commonwealth. However, both witnesses testified as to the similarity of their respective trades throughout the Commonwealth. Mr. Risaliti also testified as to such similarities. Furthermore, as the Board noted in its opinion, it would be

"unreasonable" to require the Bureau to produce "multiple expert witnesses from the same craft merely because the subject projects extend across union jurisdiction lines." (Opinion of Board at 43–44).