Inez Wasko, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Submitted on briefs November 29, 1984, to Judges ROGERS and WILLIAMS, JR. and Senior Judge KALISH, sitting as a panel of three.

*Kenneth R. Alford,* for petitioner.

*Richard F. Faux,* Associate Counsel, with him, *Charles G. Hasson,* Acting Deputy Chief Counsel, for respondent.

OPINION BY SENIOR JUDGE KALISH, February 27, 1985:

Inez Wasko appeals from the order of the Unemployment Compensation Board of Review (Board) affirming the decision of a referee denying her unemployment compensation benefits on the ground that she voluntarily quit work without cause of a necessitous and compelling nature.[1]  We reverse.

Wasko contends that the Board erred in concluding that she left work without a cause of a necessitous and compelling nature.  Although the Board is the ultimate finder of facts, the conclusion of whether a claimant had cause of a necessitous and compelling nature for leaving work is a question of law subject to this Court's review.  *Willet v. Unemployment Compensation Board of Review,* 59 Pa. Commonwealth Ct. 500, 429 A.2d 1282 (1981).

---

[1] Section 402(b) of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(b).

18

The referee found and the Board affirmed the following facts, which are not in dispute:

1. The claimant was last employed by Borough of Wheatland for three years and four months as secretary-treasurer at a final annual salary of $9,800.00. Her last day of work was December 31, 1981.

2. Throughout her employment, the claimant had constant problems with the Mayor of Wheatland who interfered with the claimant's performance of her job duties.

3. The Mayor had no business interfering with the claimant's work since she had no control over the claimant nor did she have the authority to discharge the claimant.

4. The claimant reported her problem with the Mayor to the Members of Council who fully supported the claimant.

5. Council Members established a "closed-door policy" which provided that the door to the claimant's office be closed when the Mayor was in residence in Council chambers.

6. Council also adopted a resolution which prohibited the Mayor from interfering with the claimant.

7. Neither the "closed-door policy" nor the resolution prohibiting the Mayor from interfering with the claimant could be enforced and the Mayor continued to interject herself in the claimant's job duties.

8. The President of Council, who was one of the major supporters of the claimant during her battle with the Mayor, lost his bid for reelection in the general election in November of 1981.

9.   Because the claimant felt that without the support of the President of Council, her problems with the Mayor would magnify, she submitted her resignation to Council in December of 1981, which was to be effective December 31, 1981, indicating she was resigning for personal reasons.

10.   During the last week of December of 1981, another Council Member, who later was elected President of Council, asked the claimant to reconsider her decision to resign and promised to fully support the claimant in her problems with the Mayor.

11.   Despite this reassurance. the claimant refused to rescind her resignation and informed the Council Member she was resigning for personal reasons.

12.   Continuing work was available to the claimant had she desired to remain employed.

The Mayor interfered with Wasko's work by demanding that she type all the Mayor's correspondence and perform other secretarial functions which were not part of her duties.   The Mayor also demanded that Wasko refer all complaints received by the Council Office to the Mayor, rather than to the President of Council, as she had been instructed to do by Council.   The Mayor, throughout Wasko's employment, attempted to cajole Wasko into performing work for her that was not within her assigned duties or was directly counter to her assigned duties.[2]

---

[2] Notes of Testimony pp. 6-9:

Q[uestion] C[laimant's] L[awyer] [Kenneth Alford]:

Did anyone ever interfere with your interaction with people?

A[nswer] C[laimant] [Inez Wasko]:

Oh, the Mayor, Helen Dubie (phonetic sp.), constantly interfered with people coming in and out of my office.

Mere personality differences between an employee and his or her supervisor do not give rise to cause of a necessitous and compelling nature. *Penkola v. Un-*

---

QCL: Now how was this done?

AC: Well, for one thing, my door was closed so that I have this privacy, cause she was right across the hall. The Council permitted her to have a desk in the Council chambers. And everybody coming into the office, she would take them into there before they could even get to my door. And then she would come in and ask for a building permit or something, which it was my duty to do these, so I would not give her the building permit.

QCL: Why was that?

AC: Because that was my job. I was to handle that.

QCL: That was your responsibility?

AC: Yes, that was my responsibility.

QCL: So you would—

AC: So that I'd get the information from the people and have them fill the permits in my office. Usually she stood right there all the time all of this was being transacted.

QCL: Did she interfere in any other way with your daily duties as far as the work you were supposed to be doing?

AC: Well, by her interferring [sic] with the people coming in created a lot of problems. I would get phone calls complaining. I would direct them to the council members in charge, cause Council has committees. All these committees has usually three councilmen on the committee, and one of them is named the chairman. If I have a problem in any certain area, I was to get a hold of the chairman of that committee, whichever, if it's the street department or animals or whatever, I would get a hold of the chairman of that committee and that would be their problem. Any complaints I got, I would call the chairman. He would handle it from there. Now she used to, she was furious about that. She wanted to be informed of everything that went on in that office regardless. I was to go to her. I wasn't to go with her from; I was supposed to go to Council, and these chairmen of these committees call them on a present of council if I couldn't get them. And she always was creating things because of that.

*employment Compensation Board of Review*, 32 Pa. Commonwealth Ct. 326, 379 A.2d 890 (1977). However, " 'good cause' for voluntarily leaving one's employment (*i.e.* that cause which is necessitous and compelling) results from circumstances which produce pressure to terminate employment that is both real and substantial, and which would compel a reasonable person under the circumstances to act in the same manner." *Taylor v. Unemployment Compensation Board of Review*, 474 Pa. 351, 358-59, 378 A.2d 829, 831-32 (1977).

In the instant case, the undisputed facts reveal that the Mayor had repeatedly and deliberately inter-

---

QCL: You say, you indicated in your testimony that you were to go to her. Did she direct you to come to her?

AC: Oh, she come in and she would get very upset and tell me I was to come to her with everything, any complaints or anything, that she was the Mayor of the Borough and I was to come to her. So I would bring this to a council meeting to council and present it to them. And then they would tell her that she is not the chief executive officer, that the president of council is, and she would argue that fact. She'd say she was the chief executive. She'd even argue with the attorney about it.

• • •

QCL: Now during this eight-month period, how would you characterize your relationship with her and her attitude toward you?

AC: She always treated me inferior. I mean, anybody come in, she'd dismiss me. If somebody would come in to my office with a problem and she didn't catch them before they came in, she would bang on that door until you opened that door and let her in. And then she would take that person over completely and dismiss me like I, I mean she just dismissed me like I didn't even exist. And she just made me, always trying to make me feel inferior like she was the boss and to eliminate me out of this. And she would take them right out of my office the majority of the time right over into where her desk was in the other office.

fered with Wasko's performance of her duties. Moreover, Wasko attempted to remedy the problem by reporting the situation to Council. The Mayor, believing that Council had no authority over her, ignored the resolution and the "closed-door policy" and continued to cajole Wasko into doing the Mayor's work.[3] Pressured by the Mayor to answer her and hired by Council to work for it, Wasko's resignation under the circumstances of this case was consistent with ordinary common sense and prudence. *Id.* The Board thus erred as a matter of law in concluding that Wasko

---

[3] Notes of Testimony p. 20:

Q[uestion] E[mployer's] L[awyer] [Robert Lackey]:

Was there any law that the Borough could enforce against the Mayor to keep her out of the Borough building during the day?

A[nswer] C[laimant's] W[itness] 1 [Walter O'Kresik, former President of Council]:

Well, Council passed a resolution informing the Mayor that she don't have no business interfering with the Secretary, which didn't mean a darn thing to her. We'd just as well had gone ahead and just forgot about the resolution, because it was passed by a majority of Council. And she was there when the resolution was made up and approved by Council, a majority of Council. But it didn't mean a darn thing to her. And our Solicitor told her the rules and regulations and the laws in the code book about the duties of the mayor and about the resolution, but it didn't mean a darn thing to her.

QEL: And she had a right to come into the Borough building during the day. You couldn't keep her out?

ACW1: Well we can't keep anybody out of a public building.

QEL: Was the Mayor, you described her as aggressive, domineering and bossy, did she treat other people that way?

ACW1: Well, she's a heck of a good person until she gets her point and once she gets what she wants. And after she gets what she wants, she gets very domineering and aggressive.

voluntarily left work without cause of a necessitous and compelling nature. Reversed.

ORDER

The order of the Unemployment Compensation Board of Review, Decision No. B-219169, dated June 23, 1983, is hereby reversed.

Judge WILLIAMS, JR., dissents.

This decision was reached prior to the resignation of Judge WILLIAMS, JR.