# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gary H. Powell,                          :
                        Petitioner    :
                                            :
              v.                       :   No. 1418 C.D. 2017
                                            :   Submitted: April 20, 2018
Unemployment Compensation                :
Board of Review,                         :
                        Respondent    :

BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
                   HONORABLE MICHAEL H. WOJCIK, Judge
                   HONORABLE ELLEN CEISLER, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**                **FILED: February 1, 2019**

Gary H. Powell (Claimant) petitions, *pro se*, for review of an order of the Unemployment Compensation Board of Review (Board), mailed August 15, 2017, which affirmed an Unemployment Compensation Referee's (Referee) decision, denying Claimant unemployment compensation benefits under Section 402(b) of the Unemployment Compensation Law (Law).[1]  For the reasons set forth below, we affirm.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b). Section 402(b) of the Law provides, in part, that a claimant shall be ineligible for compensation for any week in which the claimant's unemployment is due to voluntarily leaving work without cause of a necessitous and compelling nature.  "[W]hether a claimant had cause of a necessitous and compelling nature for leaving work is a question of law subject to this Court's review." *Wasko v. Unemployment Comp. Bd. of Review*, 488 A.2d 388, 389 (Pa. Cmwlth. 1985).

Claimant applied for unemployment compensation benefits after he voluntarily resigned his position with Joe Krentzman & Son Inc. (Employer) on September 24, 2013. The Altoona UC Service Center (Service Center) found Claimant ineligible for benefits under Section 402(b) of the Law, pertaining to voluntary termination without cause of a necessitous and compelling nature. Claimant appealed, claiming that he had necessitous and compelling cause to quit because he was assaulted at work.

During the course of several hearings before various referees, Claimant testified and presented the testimony of Dave Parks, Wesley Wagner, and Scott Brown, all of whom were employed by Employer at the time of the incident that led to Claimant's separation. Employer presented the testimony of Employer's President, Michael Krentzman (President), and Employer's Chief Financial Officer, Dale Watkins (CFO). For ease of presentation, we summarize the relevant testimony of the witnesses with a focus on the alleged assault.[2]

Claimant testified that during his employment with Employer, his direct supervisor was Employer's Operational Manager, David Krentzman.[3] (R.R. at R-15 to R-16.) On the day in question, Claimant had just finished a job for the Operational Manager when the President asked him to take over supervision of the metals department that day. (R.R. at 15a.) There was a lot going on that day. (*Id.*) A machine was down, and Claimant still had his normal duties in addition to the metals room. (*Id.* at R-16.) The President questioned Claimant as to whether Claimant could perform the tasks, and Claimant told him about other tasks he needed to

---

[2] At the outset, we note that Claimant's numbering of pages of the Reproduced Record (R.R.) is somewhat inconsistent and haphazard and does not fully comply with Pa. R.A.P. 2173.

[3] The Operational Manager was also a Co-President of Employer and the brother of the President.

2

perform.  (*Id.* at 16a, 67a.)  The President said that he would take care of the other tasks and instructed Claimant to do the tasks assigned by the President.  (*Id.* at 16a, 68a.)  Claimant asked the President how Claimant was supposed to handle some of the things, but the President did not have an answer and just told Claimant that he needed these things to be done.  (*Id.* at 16a.)  Claimant then started to talk about his job performance, and the President responded by saying that Claimant had poor job performance and demeaned him in front of 5 or 6 people and eliminated his authority.  (*Id.* at 16a, 68a.)  Claimant then told the President that he was going to see Steven Krentzman, Employer's owner and Chief Executive Officer (CEO), to get things straightened out.  (*Id.* at R-17, 68a, 69a, R-70.)  Claimant believed the CEO could tell him how and what to do.  (*Id.* at R-17.)  When he went to see the CEO, the President went around Claimant, blocked Claimant's path, and put his hand on Claimant.  (*Id.* at R-17, 68a.)  Claimant stopped in his tracks and told the President not to touch him.  (*Id.*)  Claimant then turned, walked back to the other employees, and told them to call 9-1-1.  (*Id.*)  No one would assist him, so he left so as not to escalate matters further.  (*Id.* at 17a, 68a, R-69.)  Before leaving, he clocked out at 9:14 a.m., having clocked in at 7:00 a.m.  (*Id.* at R-69.)  Claimant testified that after he left work, he went to the State Police to file assault and harassment charges against the President.  (*Id.* at R-69.)  Claimant did not call the CEO or anyone within Employer's management.  (*Id.* at 70a.)

Claimant testified that later that evening, he had a conversation with Mr. Brown, who told him that if Claimant showed up on the premises, Employer would call the police.  (*Id.*)  Mr. Brown also told Claimant that Claimant was fired. Claimant did not follow up because he expected Employer to send him a letter, but Employer never sent anything.  (*Id.*)

3

Mr. Parks testified that the CEO told Mr. Parks at some point that Employer would not be bringing Claimant back. (*Id.* at 74a-75a.)

Mr. Wagner testified that on the day in question, he observed the President "with his hand out stopping [Claimant's] right of travel." (*Id.* at R-76.) Mr. Wagner stated that the President was standing with his back toward Mr. Wagner and his hand stuck in Claimant's chest, but Mr. Wagner also stated that he could not see if the President touched Claimant's chest. (*Id.*) The two "were hollering[, but Mr. Wagner] didn't stick around to hear what they were talking about." (*Id.* at 76a.) Mr. Wagner "kind of giggled about it because maybe they were having [a] squabble. [He] didn't think anything about it." (*Id.*) Mr. Wagner is no longer employed by Employer. (*Id.*)

Mr. Brown testified that on the day of the incident, when Mr. Brown was clocking out, one of Employer's security guards informed Mr. Brown that Claimant was fired and if he showed up on the property security personnel were supposed to call the State Police. (*Id.* at 12a.) When Mr. Brown got home, he called Claimant to tell him what he had been told. (*Id.*)

The President testified that on the day of the incident, the Operational Manager was not at work. (*Id.* at R-23.) Normally, the Operational Manager would direct operations in the metals room. (*Id.* at R-24.) Mr. Parks was the supervisor of the metals room, but he left work sick that day and put Claimant in charge of the metals room. (*Id.*) When the President went to the metals room, he could not find Claimant. (*Id.*) There was a lot going on in production that day, and the President was concerned that Claimant was not in the metals room. (*Id.* at 24a.) Claimant emerged from the break room a few minutes later. (*Id.*) The President wanted to make sure that Claimant was on site and knew what his responsibilities were that

4

day—*i.e.*, that the metals room was Claimant's only responsibility that day. (*Id.* at 24a, R-25.) Claimant responded to the President's inquiry as to whether the President could "count on" him by stating that he was the only one on whom the President could count. (*Id.* at 25a, 78a.) The President responded by letting Claimant know that there are a lot of people on whom the President could count and commented on his attitude and work performance. (*Id.* at R-26, 78a.) Approximately six other employees were in the area, but they were not close to Claimant and the President. (*Id.* at 26a.) Claimant then ranted that he works for the CEO, not the President. (*Id.* at 78a.) Claimant further stated that Claimant could do whatever he wants and was going to go talk to the CEO. (*Id.* at R-79.) The President followed Claimant and told him that they could all sit down to talk during Claimant's break at 10:00 a.m. (*Id.*) Claimant then went into the main part of the warehouse, claimed that the President assaulted him, and asked someone to call 9-1-1 or give him a cell phone. (*Id.*) The other employees laughed. (*Id.*) Then Claimant left without punching out. (*Id.*) The President instructed another employee to punch Claimant's time card, which he did. (*Id.* at R-79, 79a.) Claimant never returned. (*Id.*) The President stated that he never touched Claimant, raised his hand, made any kind of arm motion, put his hand out to restrain or stop Claimant, or moved his hands out in a gesture. (*Id.*)

The President further testified that following Claimant's departure, the President wrote a memorandum memorializing the incident. (*Id.*) Thereafter, a State Police trooper came to the facility and spoke with the President and another employee about the incident. (*Id.* at 80a.) The President told the trooper what had happened, and the trooper expressed his belief that nothing was going to happen. (*Id.*) The President then prepared a memorandum regarding this meeting with the

5

trooper. (*Id.*) The President made no effort to contact Claimant, and Claimant never contacted him. (*Id.* at R-81.)

The CFO testified that Employer took the position that Claimant "quit his job [and] walked off with no notice." (*Id.* at R-44 to R-45.) Employer considered Claimant to be absent without leave and wrote "AWOL" on his time card. (*Id.* at 31a, R-32, R-85.) As a result, the CFO instructed security guards on September 24, 2013, not to admit Claimant if he appeared on the premises after work hours and to instruct Claimant that Claimant should report during regular work hours. (*Id.* at R-46, R-52, R-85.) He did so because it is Employer's policy not to give former employees access to the plant except during regular business hours. (*Id.* at R-49.) The CFO also instructed security guards to advise Claimant to see the Operational Manager, President, or CEO before resuming duties. (*Id*. at 31a, R-32.) He did so because it was possible, given Claimant's volatile attitude, he would return to work. (*Id.*) According to the CFO, the situation was fluid and Claimant had worked for Employer for a long time, so it was possible that Claimant could have come back. (*Id.* at R-32.) The day of the incident, the CFO did not tell security that Claimant was fired and could not come back to work. (*Id.*)

Based upon the above testimony, the Board affirmed a decision of Referee Hess, thereby denying benefits pursuant to Section 402(b) of the Law. In so doing, the Board issued the following findings of fact:

1. Joe Krentzman & Son, Inc., employed the claimant beginning April 1993, finally as a maintenance director.

2. The employer's operations manager was the claimant's direct supervisor.

3. Although the employer's president did not ordinarily participate in the daily floor management

6

of the employer's facility, he had authority to direct employees if circumstances required.

4. On September 24, 2013, the claimant's supervisor left early and the operations manager was absent, so the president approached the claimant and directed him to manage the ferrous metals department for the day and notified him of several tasks that needed to be completed that day.

5. The president asked if he could count on the claimant, who responded that "he was the only person [the employer] can count on."

6. The president acknowledged that he could count on many employees and noted that he could not always count on the claimant because of his recently declining performance.

7. Although other workers were visible in the area, they were too far away and the facility was too loud for them to hear the president's comments.

8. The claimant proclaimed that he did not work for the president or the operations manager, but only for the employer's owner and proceeded to walk to the owner's office.

9. The president followed the claimant and told him that he could talk to the owner, but not until his 10:00 a.m. break because the department needed to be managed until then.

10. The president did not touch the claimant during this exchange.

11. The claimant publicly accused the president of assault, but his co[-]workers did not take him seriously or assist him.

12. The claimant left the facility without clocking out and drove to a Pennsylvania State Police barracks to file a complaint of assault and harassment by the president.

13. The president instructed the scale master to clock out the claimant at 9:22 a.m. and immediately drafted an e-mail to other managers detailing the incident, expressing that he believed the claimant

7

had resigned, and recommending his resignation should be accepted.

14. A state trooper visited the facility and investigated the claimant's complaint, but the president was not charged with any offense.

15. The employer's chief financial officer told security staff that, if the claimant returned to the facility, he should be instructed to return during regular business hours to meet with senior management before resuming his duties.

16. The claimant did not return to work or contact the employer.

(Board's Decision at 2-3.)

The Board first considered whether Claimant voluntarily quit his employment or whether Employer terminated Claimant's employment. In support of Claimant's contention that Employer terminated his employment, Claimant relied upon a statement of Mr. Brown that one of Employer's security guards told Mr. Brown that Employer discharged Claimant, Claimant was no longer permitted on Employer's property, and Employer would contact the State Police if Claimant were on the property. The Board observed that the CFO testified he told security staff that, if Claimant returned to the facility, Claimant should be instructed to return during regular business hours to meet with senior management before resuming his duties. The Board considered the testimony of the two witnesses and acknowledged that the CFO's statement had been orally transmitted through several individuals before it reached Claimant. The Board determined, regardless of the hearsay objection, that Mr. Brown's testimony did not establish that Employer terminated Claimant's employment. The Board reasoned:

> Because the guard did not testify, the Board does not have his perspective of what the CFO told him or whether what he told the co-worker was what the CFO told him or combined with rumor or speculation. Likewise, the

8

> co-worker's testimony could be clouded by misunderstanding or misremembering or separately impacted by rumor or speculation. Considering the respective reliability of these statements, the Board credits the CFO that the guard was not told that the claimant was discharged.
>
> Because the guard's statement went beyond the scope of the CFO's instruction, the Board concludes that it does not fit into the [hearsay] admission exception. Even if it did, however, being competent evidence does not make it credible, and the Board would discredit it for the reasons given above. Consequently, there is no competent, credible evidence that the claimant was told he was discharged.

(*Id.* at 3-4.)

The Board next considered whether Claimant established cause of a necessitous and compelling nature to quit and concluded he did not. In so doing, the Board analyzed Claimant's intention and reasoned:

> The claimant did not clock out and left the employer's facility. This, alone, does not evidence intention to quit, especially considering that the claimant testified he intended to return to work the next day. However, the claimant did not return to work. The claimant gave conflicting reasons for his failure to return: he was fired and he did not want to be arrested. Because both of these situations have been discredited, neither justifies the claimant's actions. Regardless, neither situation would prevent the claimant from calling the owner and speaking with him, as he stated he intended to do on September 24, 2013. The claimant claimed he did not call the owner because he did not want to make the situation worse, but did not explain how it could have been worse, considering that he allegedly believed he had been discharged. Therefore, the Board concludes that the claimant quit.
> . . . .

9

> The claimant, likewise, has not credibly established that the president pushed him or physically threatened him. Even the claimant's witness could not corroborate that the president touched the claimant. The claimant's co[-]workers appeared to not take his accusation seriously, nor did the State Police. Conversely, the president credibly testified he did not touch the claimant. Therefore, the Board cannot conclude that the alleged contact was a necessitous and compelling reason to quit.

(*Id.* at 4.)

On appeal,[4] Claimant, no longer represented by counsel, argues he was denied due process. Claimant also argues that substantial evidence does not exist to support the Board's findings and that the Board erred in concluding that Claimant voluntarily quit his employment.

With regard to his due process challenge, Claimant argues that he was entitled to due process in the form of a fair hearing by a neutral fact finder. The essential elements of due process in an administrative proceeding are notice and an opportunity to be heard. *Groch v. Unemployment Comp. Bd. of Review*, 472 A.2d 286, 287-88 (Pa. Cmwlth. 1984); *Wojciechowski v. Unemployment Comp. Bd. of Review*, 407 A.2d 142, 143 (Pa. Cmwlth. 1979). Claimant appears to argue that he did not receive due process because the various referees work together and for the Board. Claimant cites *Lyness v. State Board of Medicine*, 605 A.2d 1204 (Pa. 1992), in support of his argument.

We disagree that the Board denied Claimant due process of law as a result of the referees' relationships with each other and the Board. The referees' and Board's functions are set forth in Section 203 of the Law, *as amended*, 43 P.S. § 763.

---

[4] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

10

Section 203(e) of the Law provides, in part: "It shall be the duty of a referee, under the supervision, direction and administrative control of the [B]oard, to hear and decide disputes in accordance with the provisions of this act and to conduct such other and further hearings in connection with the foregoing as may be required by the Board." Pursuant to Section 203(c) of the Law, "[t]he [B]oard shall be a departmental administrative board, and shall have all the powers and perform all the duties generally vested in, and imposed upon, departmental administrative boards and commissions by The Administrative Code [of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §§ 51-732]." The Board has the duty "to hear appeals arising from claims for compensation, adopt, amend or rescind such rules of procedure, undertake such investigations, and take such action required for the hearing and disposition of appeals as it deems necessary and consistent with [the Law]." Section 203(d) of the Law, 43 P.S. § 763(d). Although the referees are under the Board's supervision, direction and administrative control, the referees independently issue their decisions, and the Board reviews the referees' decisions only when appealed to the Board.

We disagree with Claimant that this framework for the review of unemployment compensation claims violates due process under the Pennsylvania Supreme Court's decision in *Lyness*. *Lyness* prohibits the commingling of prosecutorial and adjudicatory functions, based on the notion that the same individual should not be empowered or have the responsibility to act as both prosecutor and judge. *Lyness*, 605 A.2d 1208-11. In other words, *Lyness* stands for the proposition that an agency violates due process when the same individual responsible for making a decision to prosecute also sits in judgment of the charges and imposes sanctions based on the charges. *Id. Lyness* clearly does not apply to

11

the situation at hand. First, neither the referees nor the Board functioned as prosecutors, and no prosecution or disciplinary action occurred. Second, even if we were to ignore the lack of any sort of prosecutorial function, no member of the Board had any involvement in the decision-making regarding the merits of Claimant's claim at any stage prior to the appeal to the Board. Rather, the UC Service Center made an initial determination as to Claimant's entitlement to unemployment compensation, and the referees then conducted hearings in order to issue a determination. On appeal to the Board, the Board reviewed Referee Hess's decision and made its own independent determination. Given that the Board is not involved in the UC Service Center's or referees' decision-making process, the concerns underlying the Supreme Court's decision in *Lyness* are not present in this matter.[5]

Claimant also argues that he was denied due process because he wanted his witness, Mr. Brown, to testify in person, but Claimant's attorney arranged for Mr. Brown to testify by telephone against Claimant's wishes.[6] Claimant appears to imply that, had Mr. Brown testified in person before Referee Kauffman, the credibility determinations would have been different. At the outset, we note that, although represented by counsel at the hearing, Claimant did not object or express

---

[5] To the extent that Claimant implies that a referee or the Board acted with bias, Claimant does not develop any argument regarding bias, and the Court perceives no bias in the referees' or Board's decisions.

[6] Claimant also argues that he was denied due process because he did not receive a copy of the cover sheet or page 1 of the transcript. Claimant does acknowledge having been provided the sound recordings of the transcript, and he does not indicate how the Board's alleged failure to provide him with the first page of the transcript harmed his ability to proceed with this appeal. Furthermore, the Board, in its brief, notes that it, too, had not received page 1 of the transcript in the record it reviewed. Since then, however, it acquired page 1 and had attached it to its brief as Appendix "B." Page 1 of the transcript does not contain any witness testimony or address any matter relevant to this appeal. For that reason, to the extent that any error occurred, we conclude that the error was harmless.

12

any concern to the referee at the time the referee received Mr. Brown's testimony via telephone. Furthermore, Claimant was in no way disadvantaged by having Mr. Brown's testimony received by telephone. As noted by the Board, here, the Board made the credibility determinations and acted as the fact finder. The Board, in determining credibility and finding facts, reviewed only transcripts of the testimony. It did not directly observe any witness's testimony. Thus, there is simply no basis to support a contention that the Board denied Claimant due process in any way.

Next, Claimant argues that substantial evidence does not exist to support the Board's finding of fact number 10—*i.e.*, that the President did not touch Claimant during their exchange. Essentially, Claimant takes issue with the Board's credibility determinations. Substantial evidence is defined as relevant evidence upon which a reasonable mind could base a conclusion. *Johnson v. Unemployment Comp. Bd. of Review*, 502 A.2d 738, 740 (Pa. Cmwlth. 1986). In determining whether there is substantial evidence to support the Board's findings, this Court must examine the testimony in the light most favorable to the prevailing party, giving that party the benefit of any inferences that can logically and reasonably be drawn from the evidence. *Id*. A determination as to whether substantial evidence exists to support a finding of fact can only be made upon examination of the record as a whole. *Taylor v. Unemployment Comp. Bd. of Review*, 378 A.2d 829, 831 (Pa. 1977). The Board's findings of fact are conclusive on appeal only so long as the record taken as a whole contains substantial evidence to support them. *Penflex, Inc. v. Bryson*, 485 A.2d 359, 365 (Pa. 1984). "The fact that [a party] may have produced witnesses who gave a different version of the events, or that [the party] might view the testimony differently than the Board is not grounds for reversal if substantial evidence supports the Board's findings." *Tapco, Inc. v. Unemployment*

13

*Comp. Bd. of Review*, 650 A.2d 1106, 1108-09 (Pa. Cmwlth. 1994). Similarly, even if evidence exists in the record that could support a contrary conclusion, it does not follow that the findings of fact are not supported by substantial evidence. *Johnson v. Unemployment Comp. Bd. of Review*, 504 A.2d 989, 990 (Pa. Cmwlth. 1986).

It is well settled that in unemployment compensation cases, the Board is the ultimate fact finder and is, therefore, entitled to make its own determinations as to witness credibility and evidentiary weight. *Peak v. Unemployment Comp. Bd. of Review*, 501 A.2d 1383, 1385 (Pa. 1985). In making credibility determinations, the Board "may accept or reject the testimony of any witness, in whole or in part." *Greif v. Unemployment Comp. Bd. of Review*, 450 A.2d 229, 230 (Pa. Cmwlth. 1982). The appellate court's duty is to examine the testimony in the light most favorable to the party in whose favor the Board has found, giving that party the benefit of all inferences that can logically and reasonably be drawn from the testimony. *Taylor v. Unemployment Comp. Bd. of Review*, 378 A.2d 829, 831 (Pa. 1977).

Here, Claimant and the President provided similar testimony regarding the incident at issue, with the exception of whether the President touched Claimant during their verbal exchange. In concluding that Claimant lacked cause of a necessitous and compelling nature to voluntarily quit his employment, the Board specifically found that Claimant did not credibly establish that the President pushed him or physically threatened him. The Board noted that even Claimant's witness, Mr. Wagner, could not corroborate that the President touched Claimant, and other employees and the State Police appeared not to take Claimant's accusation seriously. Simply put, the Board found the President's testimony credible and did not find credible Claimant's testimony regarding physical contact between Claimant and the

President. Such a credibility determination lies within the purview of the Board, and this Court will not disturb it on appeal.

Finally, Claimant argues that the Board erred in concluding that Claimant voluntarily quit his employment. Claimant, in making this argument, points to evidence he contends establishes that Employer terminated his employment. Claimant specifically points to the effective date of the cancellation of his insurance and his understanding that Employer's security guard was told to arrest Claimant if he came back to the property.

With regard to the effective date of the cancellation of his insurance, Claimant argues that the fact that Employer canceled his insurance coverage is evidence that Employer knew that Employer fired him. The Board did not find the cancellation of Claimant's insurance to be relevant to the issue of whether Claimant voluntarily quit his employment and did not make any findings regarding Claimant's insurance. We cannot conclude the Board erred in determining that the cancellation of insurance had any relevance to whether Claimant quit or was fired. Regardless of whether Claimant quit or was fired, Employer would have taken steps to cancel Claimant's insurance coverage. Thus, Employer's cancellation of Claimant's insurance does not establish the circumstances of Claimant's separation.

As to Claimant's contention that the fact that Employer would have him arrested if he returned to the property is evidence that Employer fired him, the Board found the CFO's testimony credible that the CFO only instructed Employer's security guards that, in the event Claimant appeared at the property after regular business hours, they should advise Claimant to return to the property during regular business hours. Thus, the CFO's instructions to Employer's security guards also does not establish the circumstances of Claimant's separation.

15

Accordingly, we affirm the order of the Board.


_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gary H. Powell,                              :
                     Petitioner             :
                                             :
          v.                                 :          No. 1418 C.D. 2017
                                             :
Unemployment Compensation                    :
Board of Review,                             :
                     Respondent             :

# **O R D E R**

AND NOW, this 1st day of February, 2019, the order of the Unemployment Compensation Board of Review is AFFIRMED.

_____
P. KEVIN BROBSON, Judge